**UNITED STATES of America,
Appellant,**

v.

**Daniel J. QUINN, Defendant, Appellee.**

No. 86–1388.

United States Court of Appeals,
First Circuit.

March 23, 1987.*

Rehearing and Rehearing En Banc
Denied March 23, 1987.

Bownes, Circuit Judge, dissented and
filed opinion.

---

* This opinion and dissent supersede the opinion
and dissent issued on December 30, 1986 and
since withdrawn.

Margaret D. McGaughey, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., Portland, Me., and William H. Browder, Jr., Asst. U.S. Atty., Bangor, Me., were on brief, for appellant.

Daniel Patrick Leonard with whom James Michael Merberg, Boston, Mass., was on brief, for defendant, appellee.

Before CAMPBELL, Chief Judge, BOWNES and TORRUELLA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

This case was previously before us when the government appealed from an order of the United States District Court for the District of Maine suppressing certain statements and physical evidence seized in connection with the arrest of defendant-appellee, Daniel Quinn, and a co-defendant, Thomas Streifel. The detailed facts are found in that opinion. *United States v. Streifel*, 781 F.2d 953, 954–57 (1st Cir.

1986). A summary will suffice for present purposes.

In March of 1984, a reliable informant told investigators from the Drug Enforcement Administration that a house in Naples, Maine, later found to be rented to one Cushner, was used as a "stash house" to store marijuana and that the persons involved used rented cars to transport the controlled substance. As a result of the informant's communications, agents followed a vehicle driven by one Sterner to the Cushner house. After Sterner's car left the house, they stopped and searched it, finding five bales of marijuana in the trunk.

Afterwards, on the same day, DEA agents commenced preparations to get a warrant to search the Cushner house. Pending issuance of the warrant, five officers, and a dog trained to identify marijuana by smell, went to the Cushner premises to "secure" them. Shortly after the five arrived, two of them, Steadman and Holmes, temporarily left to make a phone call that would give agents in Portland more information to be included in the search warrant. While the two officers were absent, two cars drove into the plowed Cushner driveway at about 10:45 in the evening. The first car, driven by Streifel, pulled in back of one of the agents' cars, and the other car, driven by appellee Quinn, parked behind the Streifel car. Streifel and Quinn were asked by a uniformed officer for identification and to explain why they were at the cottage. Streifel produced his license and a rental agreement for his car while Quinn produced a car registration in his name. By way of explanation for their presence, Quinn replied that he was following Streifel to the house, as Quinn had been interested in renting it for the summer. Quinn and Streifel were told that they could not leave until the two absent officers returned.

At about 10:50 these two, Steadman and Holmes, arrived. They parked their car in back of Quinn's car. There is a dispute as to whether after this action Quinn could have moved his car from the driveway. Appellee says he could not. The govern-

ment says he could and cites to the transcript to support its contention that in fact other cars had done so. Agent Steadman asked both Quinn and Streifel what they were doing there, and they repeated that they had come to look at the cottage because Quinn was interested in renting it. Quinn and Streifel gave conflicting answers to questions about how they had met and how long they had known each other.

At approximately 11:10 the dog was instructed to "find the dope," and it stopped at the trunk of Quinn's car, reacting positively. Quinn was asked for permission to search the car, and he granted it, opening the trunk himself. The dog jumped inside and began digging at the floormat. The agent in charge of the dog then observed marijuana seeds and coffee grounds. Removing a blanket from where the dog was digging, the officer smelled marijuana remains. Quinn then asked that the dog be removed and the officer complied. Cushner himself then arrived, and Agent Steadman asked him several questions including his relation to the house and whether he knew Quinn and Streifel. At this point, at about 11:25 p.m., Cushner and Quinn were given *Miranda* warnings. After a few more questions Agent Steadman and another officer accompanied Cushner inside the house. They found a plastic bag containing marijuana lying on a bureau. At approximately 11:45 p.m., Cushner, Quinn, and Streifel were arrested.

When this case was first before us, we determined that at least the initial questioning and detention of Streifel and Quinn at the scene had been a lawful *Terry* stop. *Streifel*, 781 F.2d at 959. We vacated and remanded for the district court to decide when, if ever, "the *Terry* stop of Streifel and Quinn matured into custodial interrogation necessitating the administration of *Miranda* warnings." *Id.* at 960. We said that "[i]f the district court determines that Streifel and Quinn were placed in custody within the meaning of *Miranda* before they were advised of their rights, it may order suppressed any statements elicited in violation of *Miranda*, and, in light of its order, it should also make such rulings concerning the suppression of other evidence as it deems appropriate." *Id.* at 962.

No further evidence was taken on remand. Relying on the original record, the district court arrived at essentially the same determination as before, finding that a *de facto* arrest without probable cause had occurred at the time Agents Steadman and Holmes "returned to the Cushner cottage and parked their cruiser in such a manner that neither defendants' car could be moved from the driveway." According to the court, the officers "affirmatively chose to block defendant in." The court likened the situation to a "stationhouse interrogation," turning a brief and temporary stop "into one fraught with pressure for defendants Quinn and Streifel." Therefore, it suppressed the statements made by Quinn to Steadman without *Miranda* warnings and all the materials obtained from Quinn's automobile, as the fruits of an illegal arrest.

In selecting the purported blocking of defendants' car as the incident converting a *Terry* stop into an arrest, the district court explained that this event "in the total context then existing, was a determining factor tipping the balance in favor" of an arrest finding. The "total context," as elsewhere discussed by the court, was that there were as many as five policemen and a police dog at the scene, defendants' identification was not returned to them, they were kept apart while being questioned, and their interrogation was not done in a public place but in a remote cottage late at night. While there was no physical contact between the officers and defendants, no display of weapons, and no statements at this time indicating an arrest, the court concluded that an atmosphere was created threatening and coercive enough to warrant—indeed to require—the administration of *Miranda* warnings. The court also found that, since the agents lacked probable cause when the *de facto* arrest occurred, they could not use the fact that the dog later alerted to Quinn's car as justification for the search of the automobile's trunk. The court believed that Quinn's consent to the search of the trunk of his automobile was a result of the atmosphere

of police domination followed by the dog's sniff, a situation made possible only by the illegal detention. In summary, the court ordered the suppression of every kind of evidence gathered after Agent Steadman arrived at the scene. 633 F.Supp. 535.

Contrary to the court below, we believe that the actions of the police in the 20–25 minutes that transpired from the time Agents Steadman and Holmes returned until the dog sniff revealed the presence of marijuana, amounted to a reasonable continuation of the initial *Terry* stop in a "swiftly developing situation." *See United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605 (1985). The only new factors that occurred after what we previously determined was a lawful *Terry* stop, were Steadman's parking of his car behind Quinn's car and the addition of Steadman and his companion to the three officers already present. All the other circumstances that the district court mentioned as the "context" within which the two new agents arrived, were present during the situation we earlier ruled was a lawful *Terry* stop. Thus the only question is whether the blocking of the car, the augmentation of the police presence by two more officers and the continuance of the inquiry, transformed the original *Terry* stop into either a *de facto* arrest or (if any different) a situation imposing "restraints comparable to those of a formal arrest." *Berkemer v. McCarty,* 468 U.S. 420, 441, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).

## I. THE ADDITIONAL EVENTS DID NOT CHANGE THE *TERRY* STOP INTO AN ARREST.

The Supreme Court has said that "the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* and *Adams* [*v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)]." *Michigan v. Summers,* 452 U.S. 692, 700, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981). The *Terry* exception to the traditional rule disallowing detentions without probable cause has been widened in the last decade to encompass other circumstances where officers may make brief investigative stops or seizures of individuals upon reasonable suspicion that they may have committed, are committing, or are about to commit a crime. No mechanical checklist has been assembled to facilitate distinguishing between such investigative stops, on the one hand, and those detentions, on the other, which though not technical, formal arrests are the "equivalent of an arrest" and therefore require probable cause. *People v. Hicks,* 68 N.Y.2d 234, 508 N.Y.S.2d 163, 500 N.E.2d 861 (1986). Rather the cases have used a balancing test to assess these intrusions, weighing "the limited violation of the individual's privacy against the opposing interests in crime prevention and detection and in the police officer's safety." *Dunaway v. New York,* 442 U.S. 200, 209, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979). In the present case, we think the actions of the police prior to the time they formally arrested Streifel and Quinn did not go beyond an investigatory *Terry* stop and did not amount to an arrest.

The district court attached great weight to the parking of Steadman's cruiser behind Quinn's vehicle. We may assume this made it harder, perhaps even impossible, for Quinn and Streifel to leave without the police's moving Steadman's car. Yet, as we said previously, "while the blocking of a vehicle is relevant to the issue of custody, it would not necessarily elevate an investigatory stop into a *de facto* arrest requiring probable cause." *Streifel,* 781 F.2d at 961 n. 15. Based on the uncontested facts of the present case, we do not believe this manner of parking was indicative of arrest-like restraint. The three cars that had preceded Steadman were all similarly lined up, one behind the other, in the plowed driveway. At the head of the line was the cruiser occupied by the first officers to arrive. Behind them was Streifel's rented car, and behind Streifel's was Quinn's vehicle. Given that each one of these vehicles was parked directly behind the other, we can only infer that this mode of parking was a normal incident of the layout of the driveway and premises, sig-

nalling no special "custodial" designs by the owner of the rearmost car. In any case, a policeman's subjective "unarticulated plan" has no significance for these purposes. *Cf. Berkemer v. McCarty*, 468 U.S. at 442, 104 S.Ct. at 3151. The relevant inquiry, as the Court has said, "is how a reasonable man in the suspect's position would have understood his situation." *Id.*[1] We do not believe such a reasonable man, in Quinn's shoes, would have thought that Steadman's leaving of his car behind Quinn's was tantamount to placing him under arrest.[2]

Similarly, we do not believe the physical presence of two more officers, besides the three who were there when the two suspects first arrived, could have led to a reasonable inference that a *de facto* arrest had occurred. Steadman and Holmes made no threats, displayed no weapons, and exerted no physical restraint upon Quinn's person. While their arrival may have underscored the seriousness of the investigation, we do not think it would have signalled to a reasonable person, standing in Quinn's shoes, that he was under arrest.

Nor did the continued questioning of Streifel and Quinn after Steadman's arrival convert the hitherto lawful *Terry* stop into an arrest. We ruled in our earlier opinion that detaining the suspects for Agent Steadman's return was consistent with a *Terry* stop. Once Steadman arrived, it would be illogical to deny him an opportunity to confirm or dispel the suspicions that had justified the investigative stop in the first place. Checking out a suspicious person is a principal justification for an investigative stop. *See Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32

L.Ed.2d 612 (1972) ("[a] brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time"); *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985) (reasonable suspicion justifies a brief detention at the scene of a stop while officers check whether a warrant against the suspects has in fact been issued).

A more difficult question is whether the 20–25 minutes from the time of the two agents' arrival up to the dog's alerting to the presence of drugs in the trunk of Quinn's car was an excessive period of time to continue to interrogate the suspects. *Compare United States v. West*, 731 F.2d 90 (1st Cir.1984) (upholding airport stop involving somewhat comparable lapse of time before dog sniff of luggage). *United States v. Davies*, 768 F.2d 893, 902 (7th Cir.1985) (a 45–minute detention by two agents "for further questioning and advice from their superiors" held a valid investigative stop). "[T]here is no talismanic time beyond which any stop initially justified on the basis of *Terry* becomes an unreasonable seizure under the fourth amendment." *Id.* at 901. In *Sharpe*, where detentions took place for periods somewhat comparable to that here, the Supreme Court reiterated its unwillingness to draw a "bright line" in respect to the duration of a *Terry* stop. 105 S.Ct. at 1575. Stating that "common sense and ordinary human experience must govern over rigid criteria," the Court quoted with approval its early statement that, in investigating possible crimi-

---

**1.** The New York Court of Appeals, in determining whether a *de facto* arrest has occurred, has asked "what a reasonable person, innocent of any crime, would have thought had he been in defendant's position." *People v. Hicks*, 68 N.Y. S.2d 234, 508 N.Y.S.2d 163, 500 N.E.2d 861 (1986); *People v. Yukl*, 25 N.Y.2d 585, 589, 307 N.Y.S.2d 857, 860, 256 N.E.2d 172, 174 (1969); *accord Hicks v. United States*, 382 F.2d 158, 161 (D.C.Cir.1967). This court expressly does not determine whether the gloss, "innocent of any crime," is a proper element of the objective, reasonable man test announced in *Berkemer*. Even without such a gloss, the panel concludes

that a reasonable man in Quinn's position would not have understood he was under arrest.

**2.** While restrictions on the freedom of movement is a factor to be taken into account in determining whether a person is under arrest, it alone is not sufficient to transform a *Terry* stop into a *de facto* arrest. *Cf. United States v. Kapperman*, 764 F.2d 786, 790 n. 4 (11th Cir.1985) ("[N]either handcuffing nor other restraints will *automatically* convert a *Terry* stop into a *de facto* arrest requiring probable cause."). Any restraints in the present situation were, of course, of a far lesser quality.

nal activity, "the police must under some circumstances be able to detain the individual for longer than the brief period in *Terry....*" *Id.* The *Sharpe* Court went on to state, "[i]n assessing whether a detention is too long in duration to be justified as an administrative stop," it is,

> appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.... A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.

Here, we see no way that the agents could have greatly shortened their inquiry if they were to "confirm or dispel their suspicions" meaningfully. The level of reasonable suspicion was such as to warrant a thorough, rather than a cursory, check. *Compare United States v. Jodoin,* 672 F.2d 232, 235 (1st Cir.1982) (longer detention of suitcase justified where there was cause for reasonable *belief* that suitcase contained drugs). Perhaps if Steadman had had only very weak grounds for suspicion, he should, as the court below suggested, have dismissed Quinn and Streifel after one or two questions. But Steadman had not only *reasonable* grounds, he had very *strong* grounds, approaching probable cause, for suspicion.[3] We believe it would have been unreasonable to have sent Quinn and Streifel on their way after a few perfunctory questions, especially as the two suspects' divergent answers as to how they had met raised rather than lowered the level of suspicion, inviting further inquiry. We conclude that Steadman and his associates did

no more than "diligently pursue a means of investigation that was likely to confirm or dispel [his] suspicions quickly."

We think, moreover, that a reasonable man would have believed only that he was being detained for investigation, not placed under arrest. *Berkemer v. McCarty,* 468 U.S. at 442, 104 S.Ct. at 3151. Except for being directed to await Steadman's arrival, Quinn and Streifel were not told to stay nor advised they were in custody, nor were they physically threatened or held.

The district court felt that the lateness of the hour and the loneliness of the meeting place added to the suspects' sense of helplessness. Yet it must be remembered that Streifel and Quinn had freely elected to come to the Cushner house; the location and the time of night were entirely of their own, not the officers', choosing. *Compare People v. Hicks,* 68 N.Y.2d 234, 508 N.Y. S.2d 163, 500 N.E.2d 861 (1986) (police transported suspect in a cruiser to scene of the crime for possible identification by eyewitnesses; upheld as investigative stop); *United States v. Betancur-Bustamonte,* 799 F.2d 1388 (9th Cir.1986) (detention of over half an hour held justified as an investigative stop even when individual at airport was asked to accompany two agents on foot to an office approximately 100 yards away from the point of initial contact, passing on the way through two sets of locked doors). The failure of the officers to return Streifel's and Quinn's identification immediately, and the fact that use of a telephone may have been denied to Streifel (although the evidence on this latter point is scarcely clear, *Streifel,* 781 F.2d at 958 n. 9) are likewise insufficient, taken with all the other facts, to establish an arrest rather than an investigative stop.

---

**3.** The information then known to Steadman included the following:

(1) A reliable, corroborated informant had told the police that the Cushner property was being used as a stash house and that the people involved in this operation used *rented* cars to transport the contraband. Streifel's car was rented. Moreover, both men arrived together in separate vehicles, suggesting they may have intended to use them as conveyances. If just friends, it might have seemed more usual to occupy a single car.

(2) Only hours before, Sterner was stopped after he left the Cushner property. In the trunk of Sterner's *rented* car were five bales of marijuana.

(3) Defendants arrived at an unusually late hour and gave the officers less than persuasive answers to the questions the agents asked them concerning their own presence at the property. *See United States v. Gomez,* 642 F.2d 1124, 1127 (9th Cir.1981).

Quinn's conduct, we add, did not suggest he was intimidated. When Corporal Hutto asked for permission to search Quinn's car, Quinn refused, and Hutto took no further steps at the time. Quinn also declined to answer one of Agent Steadman's questions. When Quinn opened the trunk and the dog jumped in, he asked that the dog be removed.

 Use of the dog was not itself improper. To be entitled to use a dog for purposes of making a sniff test, the officers were required merely to have had "reasonable suspicion" that the car contained narcotics, at the moment it was performed. *United States v. Place,* 462 U.S. 696, 698, 103 S.Ct. 2637, 2639, 77 L.Ed.2d 110 (1983). This standard, as noted, was plainly met.

Summarizing, the conduct by the officers in this case met the double approach adopted in *Terry* in that the "action was justifiable in its inception," and it was "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). Because of the information they already had, the officers had strong reason from the beginning to suspect the two late-hour arrivals at the Cushner house. The action they took with Quinn and Streifel was reasonable in that they just tried to gather more information to determine whether these individuals were involved in the crimes they were investigating. It was not unreasonable to keep defendants at the scene until Agent Steadman, who was in charge of the operation, arrived and tried to find out the connections, if any, these individuals had with the narcotics contraband. *See United States v. Kapperman,* 764 F.2d at 792 (police acted diligently when they detained individual long enough to enable one of the officers in charge of the investigation to reach the scene and explain to the individual why he was being detained). The course of action Agent Steadman pursued was one "reasonably related in scope to the circumstances which justified the interference in the first place." He tried to ascertain whether de-

fendants were involved or not in the illegal actions. "[T]he right to interrogate during a 'stop' is the essence of *Terry* and its progeny." *United States v. Oates,* 560 F.2d 45, 63 (2d Cir.1977). No display of force took place, and there is no evidence in the record of harassment or improper conduct by the officers. The situation was not such that a reasonable man would have thought he was under arrest. Thus, "[t]he nature and extent of the detention [were] minimally instrusive of the individual's Fourth Amendment interests," *Place,* 462 U.S. at 703, thereby supporting the detention on less than probable cause. The period of time that elapsed from the moment defendants arrived at the house to the moment that probable cause arose after the dog alerted to the presence of drugs in Quinn's car, 25 minutes, was not unnecessarily long in these circumstances, especially as circumstances occurred within that period increasing the level of justified suspicion. The Supreme Court has stated:

> Admittedly, *Terry, Dunaway, Royer,* and *Place,* considered together, may in some instances create difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest. Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop. But our cases impose no rigid time limitation on *Terry* stops. While it is clear that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion," … we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.

*United States v. Sharpe,* 105 S.Ct. at 1575.

 Once the dog had alerted to a controlled substance, there was plainly probable cause to believe there were controlled substances in the car. *Adams v. Williams,* 407 U.S. at 148, 92 S.Ct. at 1924. Thus, the ensuing search of the vehicle was based on probable cause and was lawful. *Carroll v. United States,* 267 U.S. 132, 45

S.Ct. 280, 69 L.Ed. 543 (1925); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). The search of the trunk revealed coffee grounds, marijuana seeds, and a blanket in which Agent Gallagher smelled marijuana. Pursuant to this and the other evidence defendants, including appellee, were lawfully arrested.

## II. THE *TERRY* STOP WAS NOT ACCOMPANIED BY "RESTRAINTS COMPARABLE TO A FORMAL ARREST."

Having held that the detention was a proper investigative stop, not a *de facto* arrest, we now inquire whether the nature of the detention, even though a *Terry* stop, involved "restraints comparable to a formal arrest" and so necessitated *Miranda* warnings. *Streifel,* 781 F.2d at 959–60; *Berkemer v. McCarty,* 468 U.S. at 441, 104 S.Ct. at 3151. The district court evidently felt that the presence of up to five officers and a dog, the loneliness of the site, the blocking of the Quinn vehicle, and the other circumstances already mentioned, amounted to restraints of this type.

■ In speaking of "restraints comparable to a formal arrest," we do not understand the Supreme Court to have required *Miranda* warnings in situations other than "custody" as traditionally understood. Since *Miranda,* the touchstone to the need for *Miranda* warnings has been whether or not a suspect is "in custody." *Miranda* warnings must be given when a person is in custody even if in his own bedroom and in familiar surroundings. *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). *See also Mathis v. United States,* 391 U.S. 1, 3–4, 88 S.Ct. 1503, 1504–05, 20 L.Ed.2d 381 (1968) (*Miranda* warnings must be given to one in custody even if questions do not pertain to case for which he is being held).

■ Conversely *Miranda* warnings are not required when the suspect is *not* in custody. In *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), a suspect not in custody was questioned by agents for three hours without prior *Miranda* warnings. The Court held

that *Miranda* warnings were not required even though he was already the focus of the criminal investigation. Even when questioning occurs in the stationhouse, a suspect need not be given *Miranda* warnings if he went there voluntarily and there was no such restriction on his freedom as to render him in "custody." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983). In *Beheler* an individual was questioned without *Miranda* warnings in the stationhouse after he had reported a homicide in which he was apparently involved. The police took him to the stationhouse but advised him he was not under arrest. Finding there had not been a restraint on freedom of movement such as is associated with formal arrest, the Court ruled that *Miranda* warnings were not needed. In *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), where the Court ruled that, since *Miranda* violations are not constitutional, evidence obtained after them is not subject to the "fruit of the poisonous tree" test, the Court observed that "the task of defining 'custody' is a slippery one, and 'policemen investigating serious crimes [cannot realistically be expected to] make no errors whatsoever.'" *Id.,* 105 S.Ct. at 1293.

During *Terry* stops, the lower courts have held that *Miranda* warnings are not required. *United States v. Jones,* 543 F.2d 1171 (5th Cir.1976), *cert. denied,* 430 U.S. 957, 97 S.Ct. 1604, 51 L.Ed.2d 807 (1977); *United States v. Hickman,* 523 F.2d 323 (9th Cir.1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976); *United States v. Thomas,* 396 F.2d 310 (2d Cir. 1968). In *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court similarly declined to require *Miranda* warnings during a traffic stop. *Id.* at 437, 104 S.Ct. at 3148. But, as noted, the *Berkemer* Court went on to warn that, when in the course of a *Terry* stop a person is "subjected to restraints comparable to those of a formal arrest," he must be advised of his *Miranda* rights. *Id.* at 441, 104 S.Ct. at 3151.

It is not clear whether the *Berkemer* Court thought that a *Terry* stop could ever retain that character once the police used "restraints comparable to those of a formal arrest." Perhaps the Court only meant to emphasize the need for *Miranda* warnings after a *de facto*, as well as after a "formal," arrest. In any event, for reasons already discussed, we do not see the present circumstances as involving restraints "comparable to those of a formal arrest." While appellee here was detained awhile for purposes of confirming or dispelling the officers' suspicions, a reasonable man in appellee's position would not have believed that he was under arrest at the time, and pressures that sufficiently impaired the free exercise of his privilege against self-incrimination were not imposed. *Berkemer v. McCarty*, 468 U.S. at 437, 104 S.Ct. at 3148. Appellee Quinn is a lawyer and felt free to ask that the dog be removed from the trunk of his car and to refuse to answer one of Agent Steadman's questions. That the agent parked his car behind appellee's, and hence "blocked" it, did not, under the circumstances that prevailed, indicate that appellee was being placed in custody. *Hickman*, 523 F.2d at 327; *United States v. Montos*, 421 F.2d 215, 221–23 (5th Cir.1970). The officers reacted reasonably and non-coercively in the circumstances they were confronted with. It may be, as the lower court said, that the situation was "fraught with pressure" for Streifel and Quinn. They could scarcely have welcomed police questioning at the time. But the psychological pressure experienced when confronted at the scene by police is not the same as "restraints comparable to those of a formal arrest." *Berkemer*, 468 U.S. at 441, 104 S.Ct. at 3151. *Compare Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977) (*Miranda* warnings not required where suspect not in custody simply because questioning takes place in what court considers a "coercive environment").

In summary, we hold that the lawful *Terry* stop continued up and through the point when the sniff test was performed, requiring no probable cause but only reasonable suspicion that defendants had committed or were about to commit a crime when they were stopped. The results of the dog sniff gave the officers probable cause to search appellee's car. The search revealed enough evidence to warrant an arrest. At no point in the sequence of events did a custodial situation necessitating *Miranda* warnings materialize. Therefore, the statements made to the officers, the results of the canine sniff, and the fruits of the searches of the car are all admissible into evidence.

*The suppression order is reversed.*

BOWNES, Circuit Judge (dissenting).

I dissent because I think that the court has overturned the district judge's factual findings in an unwarranted fashion. The court's reversal of the decision below is primarily based on its dispute with the district judge over the proper reading of the facts.

### I.

We remanded to the district court for the following reasons:

> In an extremely close case such as this, with a record that admits of conflicting interpretations, a court of appeals is ill-equipped to undertake its own de novo assessment of the facts against the proper standard. On remand, the district court should inquire whether and when a reasonable person in Streifel and Quinn's position would have believed that he was actually in police custody and being constrained to a degree associated with formal arrest (rather than simply undergoing a brief period of detention at the scene while the police sought by means of a moderate number of questions to determine his identity and to obtain information confirming or dispelling their suspicions). ... On remand, the court may, but is not required to, take additional evidence, and may reopen and redetermine any issue covered in this appeal as, in its discretion, it sees fit.

*United States v. Streifel*, 781 F.2d 953, 962 (1st Cir.1986) (footnote omitted). We fur-

ther stated that, after making this factual finding, the court could order suppressed statements elicited in violation of *Miranda* as well as other evidence that it deemed illegally obtained. *Id.*

Determining whether a *Terry* stop exhibits restraints equivalent to those of a formal arrest involves questions both of law and of fact. At the extremes, there are cases which may be decided on almost purely legal grounds. At one end of the spectrum are cases where police suspicions are based on factors so general that they are insufficient to allow even the minimally intrusive *Terry* stop. *Terry v. Ohio,* 392 U.S. 1, 21 n. 18, 88 S.Ct. 1868, 1880 n. 18, 20 L.Ed.2d 889 (1968) (specific information required for police to make *Terry* stop). *See, e.g., Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (suspicion based merely on individual's presence in a high-crime area insufficient). At the other end of the spectrum are cases where the "trappings of a formal arrest" are so great that detention cannot be justified under "reasonable suspicion" but require probable cause. *See, e.g., Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Most cases, however, are not governed by "bright line" rules but must be decided on the basis of an evaluation of the circumstances. *See, e.g., United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

In our prior opinion, we clearly stated that this case could only be decided through such an evaluation of the circumstances. Moreover, because it was an "extremely close case," we declared ourselves "ill-equipped" to make such a determination. *Streifel,* 781 F.2d at 962. In other words, we held that this case turned on the facts and that the legal parameters governing the limits of *Terry* stops were not dispositive in one direction or the other.

The district judge cited two kinds of factors to support his view that the situation became equivalent to an arrest when Holmes and Steadman returned. First, following our suggestion that he review the facts in the light of *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), he noted that the traffic stops the Court discussed in that case, like *Terry* stops, are presumptively temporary and brief. An individual who is subject to such a stop expects that he will answer a few brief questions and be on his way. *See id.* at 437–38, 104 S.Ct. at 3148–49. The return of the two officers and the blocking of the driveway, according to the district judge, made the situation more like a prolonged, pressured, station-house interrogation. *See id.*

Secondly, the combined circumstances produced an atmosphere which, the district judge found, "can most reasonably be described as police-dominated." *See Berkemer,* 468 U.S. at 438–39, 104 S.Ct. at 3149–3150. Among the factors the judge listed were: (1) the presence of five police officers and a large, trained dog; (2) the continued retention of the car registration; (3) the keeping apart of defendants by the officers, indicating a strategy to produce confession;[4] (4) the nonpublic nature of the interrogation.[5] The district judge concluded: "Having been blocked in at this remote spot, Defendants had reason to feel at the mercy of the police and to feel that they would be detained indefinitely until they satisfied the police."

---

**4.** *Cf. Miranda v. Arizona,* 384 U.S. 436, 448, 86 S.Ct. 1602, 1614, 16 L.Ed.2d 694 (1966) ("the modern practice of in-custody interrogation is psychologically rather than physically oriented").

**5.** *Cf. Berkemer v. McCarty,* 468 U.S. at 438, 104 S.Ct. at 3149:

> Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability

of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. In short, the atmosphere surrounding an ordinary traffic stop is substantially less "police dominated" than that surrounding the kinds of interrogation at issue in *Miranda* [and its progeny].

The court's attack on the district judge's factual analysis focuses on each element individually in order to conclude that no single one could have tipped the balance in favor of an arrest. The court holds that neither the addition of two police officers, nor the blocking of the driveway, nor the duration of detention, nor the characteristics of the area in which the stop occurred, was sufficient to support the district court's holding. The district judge, however, did not rely on any single factor as *legally* dispositive, but looked at the *cumulative* impact of the various elements of restraint. While he did regard the blocking of the driveway as a "determining factor," he recognized that such blocking "does not necessarily elevate the *Terry* stop into an arrest." His decision, rather, was based on the "total factual context" thereby following our directive to make "fact-specific assessments and inquiries" of the situation as a whole, an inquiry which we declared ourselves unable to undertake.

I can understand this aspect of the court's opinion, therefore, in one of two ways. First, the court may feel that the district judge's factual findings were, as such, clearly erroneous. I see no basis in the record for such a view. Second, the court may view one or more of the elements considered by the district judge as legally irrelevant to the evaluation of the situation as a whole. I find no basis in the law for this position. As the court notes, citing *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), the Supreme Court has stressed that "common sense and ordinary human experience must govern over rigid criteria" in making the determinations in these matters. The district judge thus appropriately considered the total atmosphere of the situation in arriving at his decision.

Moreover, the court's opinion becomes confusing in its discussion of the duration of the stop. The court correctly begins its analysis with *Sharpe*, a case which rejected any "hard-and-fast, time limit" beyond which a stop becomes an arrest. *Sharpe*, 105 S.Ct. at 1575. The court then goes on to make its own assessment of the facts, overruling the analysis of the district

judge. The court states that Steadman had "not only *reasonable* grounds, he had very *strong* grounds, approaching probable cause" and it would therefore have been "unreasonable to have sent Quinn and Streifel on their way after a few perfunctory questions." I question whether this new finding of suspicion "approaching probable cause" is consistent with our first decision, let alone with the factual finding below. It is clear, though, that it renders the court's opinion internally inconsistent. For after justifying a prolonged detention (perhaps one "approaching" arrest?) and declaring the unreasonableness of release, the court goes on to restate that the detention was not overly restraining: "Except for being directed to await Steadman's arrival, Quinn and Streifel were not told to stay nor advised that they were in custody, nor were they physically threatened or held."

The court cannot have it both ways. *Terry* stops involve some restriction on individuals' freedom of movement. Yet, it cannot be factually true that there was *both* a prolonged detention, whose highly constraining nature was justified on grounds "approaching probable cause," *and* a detention that was minimally intrusive with the defendants not constrained from leaving. The court's version of the facts is not internally consistent and is certainly not compelling enough to warrant overriding the findings of the district judge.

## II.

A. *Suppression of Evidence under the Fifth Amendment*

*Miranda* established a *per se* rule. Statements elicited from persons in custody who have not been warned of their rights are inadmissible. Because I would uphold the district court's finding of custody, I would suppress all statements made after the return of Officers Steadman and Holmes.

B. *Suppression of Evidence under the Fourth Amendment*

The analysis for suppression under the fourth amendment is somewhat different.

Evidence may satisfy the requirement that it be obtained "voluntarily" under the fifth amendment and yet still be inadmissible under the fourth amendment as a product of an illegal detention. *Brown v. Illinois,* 422 U.S. 590, 601–02, 95 S.Ct. 2254, 2260–61, 45 L.Ed.2d 416 (1975). Even *Miranda* warnings are insufficient, without more, to purge the taint of an illegal detention. *Id.* Rather, a court must analyze whether the "casual connection" has been broken. *Id.* at 603, 95 S.Ct. at 2261.

Having ruled that the detention here became an arrest without probable cause at the time of the return of Holmes and Steadman, the district judge considered whether the evidence obtained after that time still bore the taint of that illegality. Once an arrest has occurred, he noted, police officers may not exploit the situation to build the probable cause they lacked in the first instance. The Supreme Court has often disapproved of such investigatory arrests. *See Florida v. Royer,* 460 U.S. 491, 503, 103 S.Ct. 1319, 1327, 75 L.Ed.2d 229 (1983); *Dunaway v. New York,* 442 U.S. at 215–16, 99 S.Ct. at 2258–59; *Brown v. Illinois,* 422 U.S. 590, 605, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975). The district judge therefore ruled that the sniff test was tainted by the illegal detention and that its results were inadmissible.

The district judge then turned to Quinn's purported consent to the car search. He relied on *Brown v. Illinois,* where the Court discussed a confession obtained as a product of an illegal detention. The Court stated:

> The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse....

*Brown,* 422 U.S. at 603, 95 S.Ct. at 2261. The district judge stated that, given the atmosphere of police domination, Quinn's "consent" could not satisfy the "casual chain" test under the fourth amendment. In addition to the elements of the situation I have listed *supra* at pages 162–63, he noted that the officers had told Quinn that they could get a warrant if he did not consent to the search. This threat of a warrant cast further doubt on the freely given nature of Quinn's consent. *See United States v. Ocheltree,* 622 F.2d 992, 994 (9th Cir.1980) (consent not voluntary when given under the threat of a warrant); *cf. Florida v. Royer,* 460 U.S. at 503, 103 S.Ct. at 1327 (discussing impact on consent of police plan to obtain warrant).

In reversing the district judge, the court does not address the problems under *Wong Sun* and *Brown v. Illinois.* It holds that the sniff test was therefore justified, and that the results of that test gave the officers probable cause to search the car without a warrant.

Because I would uphold the district court's finding of an illegal arrest, I would find that the sniff test was a product of that illegality and was an illegal attempt to supply the missing probable cause. The nature of Quinn's consent remains a difficult question. This issue should be decided in line with the Supreme Court's distinction in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416, between consent that would be "voluntary" and consent that would be strong enough to break the "causal chain." Quinn twice consented to the searches and "represented himself to the officers to be a lawyer." Yet he had earlier refused his consent to the search and agreed only after the sniff test and the threat of a warrant. The district judge noted the resulting sense of the "futility" of a refusal, thus vitiating the voluntariness of the consent. On such an "extremely close" question, involving the degree of consent based on a "record that admits of conflicting interpretations," I would follow our prior decision and defer to the district judge's assessment. I would, therefore, uphold the suppression of the warrantless searches of Quinn's car, as well as the fruits of the search conducted with the warrant secured with illegally obtained evidence.