**UNITED STATES of America**

v.

**Jonathan HART**

**No. CR 01–10314–MLW.**

United States District Court,
D. Massachusetts.

Jan. 6, 2003.

George F. Gormley, Boston, MA, for Jonathan Hart.

*MEMORANDUM AND ORDER*

WOLF, District Judge.

## I. SUMMARY

Defendant Jonathan Hart is charged in three counts of a thirty-one count indict-ment alleging violations of the federal drug and firearms laws. Specifically, Hart is charged with violations of 21 U.S.C. § 846 (conspiracy to distribute cocaine base); 21 U.S.C. § 841(a)(1) (distribution of cocaine base); and 18 U.S.C. § 924(c)(1)(A) (carry-ing a firearm during a drug trafficking crime). The firearms charge alleges that Hart carried the firearm in question on or about July 5, 2001 in Boston. On that date, Hart was stopped, searched and ar-rested by officers of the Boston Police Department. It was during this search that the firearm was found.

Hart filed a motion to suppress the fire-arm as well as drugs that were seized from his person during an inventory search fol-lowing his arrest. On October 28 and 29, 2002, the court conducted an evidentiary hearing concerning this motion. On Octo-ber 30, 2002, the court heard additional argument on the motion. For the reasons described below, the court is denying Hart's motion to suppress.

## II. FINDINGS OF FACT

The following facts are proven by a pre-ponderance of the evidence. Sergeant Jo-seph MacDonald is a seventeen year veter-an of the Boston Police Department. He is currently assigned as a sergeant in divi-sion B–3, Mattapan. He is the day shift patrol supervisor. He is also an anti-crime supervisor two days per week. In that capacity, he focuses on "impact players" in his district, and has spent time identifying them and preparing a history of their ac-tivities. MacDonald classified Hart as an impact player and prepared a history of his activities.

On May 3, 2001, MacDonald was person-ally involved with an incident involving Hart. This was the only incident involving Hart in which MacDonald was personally

involved before July 5, 2001. MacDonald did not actually encounter Hart at that time, but did go to his home at 174 Harvard Street to look for him based on a report that Hart had a weapon. This report came from an unidentified witness.

Based on police sources in the Youth Violence Strike Force, MacDonald believed that Hart was a member of the Esmond Street Crew ("ESC"), a gang involved in drug dealing, firearms violations, and violent acts.

Officer Samuel Berte has been a member of the Boston Police Department for more than seven years. He currently works as a patrolman in district B–3. Berte has known Hart for approximately two and a half years. From December of 1999 until approximately October of 2001, Berte responded to a succession of calls complaining of youths loitering and drinking beer or smoking drugs in the vicinity of 5–9 Esmond Street. Berte stated that the police received as many as three or four such calls per day and that he personally responded to them "easily" three times per week. Berte often observed Hart with a number of other individuals, including two of his co-defendants, when responding to these calls. Sometimes Berte would see Hart two or three times a day and other days he would not see Hart at all.

Officer Steven Rioux has been in the Boston Police Department for four years. He is a patrolman and Berte's regular partner.

The first week of July, 2001 was a particularly violent one in Hart's neighborhood of Boston. On July 3, 2001, Anthony Vaughn was shot in the head with a shotgun. Vaughn is a member of the "Franklin Hill group". At this time, the Franklin Hill group was feuding with the ESC. The police thought that Hart and another ESC member, Darryl Green, might be responsible for Vaughn's shooting. This was discussed around the station, but MacDonald could not fully determine the reliability of that information as he did not know where it came from beyond "street sources" of other police officers.

On the evening of July 3, 2002, shots were fired at a Volkswagen in front of 174 Harvard Street, Hart's residence.

On the afternoon of July 4, 2002, at approximately 2:00 p.m., a drive-by shooting took place at the 600 block of Blue Hill Avenue. The target of this shooting, according to a witness, was Hart. Berte and Rioux responded to the incident.

In the early morning of July 5, 2001 there was a gunfight and attempted arson at Hart's home at 174 Harvard Street. Numerous spent shell casings from multiple weapons were found at the scene. MacDonald was called to 174 Harvard Street immediately upon beginning his shift at 6:30 a.m. on the morning of July 5, 2001. In addition to observing the scene and talking to other police officers, MacDonald spoke with Hart's mother. MacDonald describes his conversation with Mrs. Hart as follows:

> What I said to Mrs. Hart was that, your son is in some danger here. There's a serious shoot-out here. The mat to the entrance of your door was lit on fire. I believe it was a ruse to get Jonathan out and have people waiting to shoot him as soon as he came out to try and put the fire out. And I said, he's gone now. He's not here. I don't want to see anything happen to him. I said, right now, we believe he's armed. We believe he poses a danger to police officers and to the people that he's feuding with. I asked her how he left the house, and was he in a car? And I also asked her if he had a gun.

.... I asked his mother, I said, so you know if he has a gun? She says, I don't know, and please don't let anything happen to my son.

.... I believed that she knew that he did have a gun..... Because of the incident that took place the night before with the shots out in front of the house and that she didn't want anything to happen to her son.

Oct. 28, 2002 Tr. at 28–30. Jonathan's parents told MacDonald that Jonathan was driving his brother Steven's car and described it. MacDonald was able to determine the license plate of Steven's car. Typically, Jonathan drove his own car.

Upon returning to the station from 174 Harvard Street, MacDonald relayed to Berte and Rioux the information concerning Hart's vehicle as well as his belief that "there was a good possibility [Hart] would be armed." *Id.* at 33. Berte responded that there were only a few places that Hart could go, one of which was on Fowler Street. Berte had no personal knowledge of Hart having a gun, but was told on July 4, 2001 by an unknown individual that Hart was carrying "heat" or "packing". Berte did not know how trustworthy this information was. He did not communicate it to any other officer including his partner, Rioux. Nor did he write it down. Berte and MacDonald agreed that Berte would look for Hart and, if he found Hart, would contact MacDonald by radio.

Before Berte's meeting with MacDonald, Berte met with the commanding officer of the B–3 district, Captain Pervis Ryans. Ryans "basically requested that we get [Hart] before someone else does." *Id.* at 88. More specifically, Ryans indicated that he "want[ed] [Hart] before someone else kills him." *Id.* at 100.

Berte went to a previously scheduled court appearance at approximately 9:00 a.m. at the Dorchester District Court. He left the courthouse at approximately 10:30 a.m. On his way back to the station he drove down Fowler Street, as he thought Hart might be in the area. When Berte drove past the home where he thought Hart might be staying, he spotted the vehicle Hart was said to be driving parked several houses further down Fowler Street. Berte drove to the next cross street, Greenwood, parked his vehicle, and called MacDonald on his police radio to report what he had observed.

MacDonald responded to the call, as did Berte's usual partner, Rioux, and two detectives, Brewster and Donlin. Thus, there were eventually five police officers at Greenwood Street. The combined knowledge of the officers included the facts described previously. There were three police cars on Greenwood Street, two marked and one unmarked. MacDonald walked away from the other officers to use his cellular phone to call Ryans and inform him that Hart's vehicle had been located. At this point, the police vehicles were parked legally and were not blocking the street.

While calling Ryans, MacDonald observed Hart's vehicle with a single male driver approaching. MacDonald verbally alerted the other officers to Hart's presence.

Hart had slept at the home of Charles Washington on Fowler Street on the morning of July 5, 2002. He left Washington's house at around 11:45 a.m. Hart walked to his car, which was parked on the street, and drove to the intersection of Fowler and Greenwood. He observed several police officers in the street. Hart made a left turn onto Greenwood, which like Fowler, is a one-way street.

When Hart turned on to Greenwood, there were two or three cars in front of his vehicle. The officers all approached

Hart's vehicle. All of the officers had their weapons drawn.

MacDonald was first. MacDonald had his firearm out. MacDonald observed that Hart was looking around frantically and was starting to sweat. The weather was typical July weather. MacDonald ordered Hart to turn the car off and Hart did. MacDonald then holstered his weapon.

Berte was second, approximately 10 to 15 feet behind MacDonald. Berte observed Hart's eyes looking around. He concluded that Hart was nervous. Thinking Hart was armed and seeking an escape route, Berte drew his weapon. Berte saw Hart's reactions that day as definitely different from those he observed during his typical interactions with Hart in the past. However, Berte's weapon was always holstered during these prior encounters.

Rioux was third. His view of Hart was somewhat obstructed by Berte and MacDonald. Rioux's weapon was also drawn.

MacDonald testified that when he approached Hart on July 5, 2001, he did not believe that Hart had previously committed a crime, but did believe that there was a good chance that Hart was then committing the crime of possessing a firearm without a license. Based on information he had gathered while preparing a history of "impact players" in his district including Hart, MacDonald believed that there was "no way [Hart] could be licensed to carry a firearm in the Commonwealth of Massachusetts." *Id.* at 72.[1] Knowingly possessing a firearm outside of one's residence without a license is a crime. *See* M.G.L. ch. 269, § 10. MacDonald believed that in view of everything that had recently transpired, Hart might well be carrying a gun.

Berte ordered Hart out of the vehicle. Hart exited the vehicle, and placed his hands on the roof. Berte frisked Hart. As Berte was reaching up for Hart's arms while conducting a pat frisk, Hart's shirt "rose up" and MacDonald observed a handgun in the front of Hart's pants. *Id.* at 39–40, 65. MacDonald yelled, "He has a gun." *Id.* at 40. MacDonald took the firearm from Hart.

Only a minute or two elapsed from the time Hart exited his vehicle until he was handcuffed. Hart's friend, Charles Washington, left his home two or three minutes after Hart and observed the police searching Hart on Greenwood Street.

After MacDonald removed the gun from Hart's pants, Hart was arrested and taken to the station. At the station Berte performed an inventory search. During this search, Berte found some crack cocaine in the pocket of Hart's pants.

## III. ANALYSIS

When the Boston Police went to search for Hart on the morning of July 5, 2001, their plan was to arrest him as soon as he was located. In an attempt to bring a halt to the cycle of violence between the Franklin Hill group and the ESC, the police thought it was advisable to get Hart off of the street. Regardless of whether Hart was actually involved in the shooting of Vaughn, the police had reliable information that the Franklin Hill group thought that Hart shot Vaughn, or were at least seeking to retaliate against Hart for the Vaughn shooting. This belief was prompted, in part, by the recent shootings on Blue Hill Avenue and at 174 Harvard Street. Con-

---

1. Among other facts that can disqualify a person from obtaining a license to carry a firearm in the Commonwealth of Massachusetts is a prior conviction or adjudication as a youthful offender or delinquent child for committing a felony or a misdemeanor punishable by imprisonment for more than two years or for violating a law regulating the use, possession or sale of controlled substances. *See* M.G.L. ch. 140, § 131(d)(i).

sequently, the commanding officer of the B-3 District ordered Berte to get Hart before someone else did.

■ The Boston Police Department had time to seek a warrant to arrest or search Hart, but did not do so. Nevertheless, as Hart was stopped while sitting in a vehicle in a public street, no warrant would have been required for an arrest if the police had probable cause to believe a felony had been committed, was being committed or was about to be committed.

> The Constitution does not require a warrant to effect an arrest in a public place. *Id.* at 423–24, 96 S.Ct. at 827–28. Moreover, law enforcement agents need only possess reasonable suspicion that a criminal activity is occurring in order to stop a moving automobile to investigate. *United States v. Kimball,* 25 F.3d 1, 6 (1st Cir.1994).

*United States v. DeMasi,* 40 F.3d 1306, 1311–12 (1st Cir.1994) (citing *United States v. Watson,* 423 U.S. 411, 417, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)). A warrant is not required to stop a vehicle in a public place to investigate or make an arrest. *Id.* Hart's suspected violation of the Massachusetts law prohibiting the carrying of a firearm without a license is a felony; the maximum sentence is five years. *See* M.G.L. ch. 269, § 10.

The government has essentially conceded that there was no probable cause to arrest Hart before he was searched. In its supplemental memorandum, the government states:

> Obtaining a warrant under the circumstances was impractical. *There was at best a questionable basis for probable cause to arrest Hart for possessing a firearm.* Regardless, at the time of the stop, even if there had been probable cause, there was no prosecutable case, as no witness or admissible evidence or testimony was available to support such a charge.

Govt.'s Supp. Memo. at 6 (emphasis added).

■ "Probable cause exists if, at the time of the arrest, the collective knowledge of the officers involved was sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." *United States v. Link,* 238 F.3d 106, 109 (1st Cir.2001) (internal quotation marks omitted). In deciding whether probable cause exists, the court examines the totality of the circumstances. *See United States v. Reyes,* 225 F.3d 71, 75 (1st Cir.2000). The court agrees that probable cause to arrest Hart did not exist until the officers saw the gun at his waist.

■ Despite lacking probable cause, the police did have a reasonable, articulable suspicion that Hart was committing a crime when they stopped him.[2] The police had good reason to believe that Hart was the target of a rival gang and that he would be carrying a weapon in order to protect himself. This information was corroborated by the fact that Hart did not sleep at home and was using his brother's automobile instead of his own, suggesting that he was attempting to avoid detection by the Franklin Hill group. The police knew that members of the ESC had access to firearms and, at times, carried them. An unidentified witness had indicated that

---

**2.** The court reaches this conclusion without taking into account Berte's unidentified person who reportedly said Hart had a gun on July 4, 2001, or Hart's physical reaction to the approach of multiple armed police officers. Neither Berte nor the court has any way to assess the trustworthiness of the report that Hart had a gun. Hart's reaction to the approach of three or more armed policemen on a hot July day was not any more characteristic of a guilty person than of an innocent one.

Hart had a gun in May, 2001. Mac-Donald's conversation with Hart's mother also indicated to him that Hart was armed. In addition, Hart's home had been the site of two attacks within the past forty-eight hours and Hart was the target of a drive-by shooting less than twenty-four hours before the police stopped him on July 5, 2001. Consequently, there was a reasonable, articulable basis to suspect that Hart was carrying a weapon for protection. These facts provide the individualized suspicion that was lacking in *United States v. Weaks*, No. 95–10242–REK, 1995 WL 791944 (D.Mass. Dec.21, 1995).

MacDonald also knew that Hart was not eligible to have had a license to carry a firearm. Therefore, if he were carrying one for protection, it would be illegal. Thus, the police had the constitutionally required reasonable, articulable suspicion that Hart was committing a crime necessary to justify a stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Accordingly, the police were justified in briefly stopping Hart to investigate their suspicions. *United States v. Moore*, 235 F.3d 700, 703 (1st Cir.2000) ("Under *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), police officers may conduct a brief, investigatory stop of an individual based on reasonable suspicion of criminal activity."). As discussed earlier, however, there was not then the probable cause necessary to justify an arrest.

■ Therefore, the key question is whether the initial stop was an arrest. It is not necessary to decide the merits of the government's assertions that the stop was justified to: (1) prevent Hart from committing a future crime of retaliation; or (2) question him regarding the shoot-out at his home earlier that morning. Thus, the court is not doing so. If the initial stop was only a *Terry* stop, the government's

reasonable, articulable suspicion was sufficient. *See United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

Under the *Terry* framework, the stop was constitutional if: (1) it was "justified in its inception"; and (2) the conduct between the stop and the arrest upon finding the gun was "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Jackson*, 918 F.2d 236, 238–39 (1st Cir.1990) (quoting *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)); *Moore*, 235 F.3d at 703. In this case, the officers had reasonable suspicion to stop Hart for carrying an unlicensed firearm and, therefore, they also acted properly by pat-frisking him to ensure their safety. *See Terry*, 392 U.S. at 30–31, 88 S.Ct. 1868; *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (holding that officers were "authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of" a *Terry* stop).

There is no "litmus-paper test," "scientifically precise formula," or "mechanical checklist" for distinguishing between an investigatory *Terry* stop and a *de facto* arrest. *United States v. Acosta–Colon*, 157 F.3d 9, 14–15 (1st Cir.1998) (citing cases). The inquiry focuses on whether, given the totality of the circumstances, a reasonable person in the suspect's position would have understood that he or she was under arrest. *See id.* "[W]here the detention is distinguishable from, yet has some features normally associated with, an arrest the analysis must revert to an examination of whether the particular arrest-like measures implemented can nevertheless be reconciled with the limited nature of a *Terry*-type stop." *Id.* (hyphen omit-

ted); cf., *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (holding that the reasonableness of seizures that are less intrusive than an arrest depend "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers"). As with most Fourth Amendment inquiries, the subjective intent of the police officers has no bearing on whether a stop was an arrest. *See United States v. Trueber*, 238 F.3d 79, 92 (1st Cir.2001) (holding that subjective intent of agents is irrelevant); *United States v. Quinn*, 815 F.2d 153, 157 (1st Cir.1987) ("[A] policeman's subjective 'unarticulated plan' has no significance for these purposes.").

Applying this test in light of First Circuit cases like *Trueber*, 238 F.3d at 91–95 and *United States v. Taylor*, 162 F.3d 12, 21–22 (1st Cir.1998), the court finds that the initial stop of Hart was a *Terry* stop, the search was reasonably related to the reason for the stop, and the police officers' reasonable suspicion justified the stop and search. *See also United States v. Perdue*, 8 F.3d 1455 (10th Cir.1993); *United States v. Prior*, 941 F.2d 427 (6th Cir.1991); *United States v. Alvarez*, 899 F.2d 833 (9th Cir.1990); *United States v. Serna–Barreto*, 842 F.2d 965 (7th Cir.1988); *United States v. Taylor*, 857 F.2d 210 (4th Cir.1988); *United States v. Hardnett*, 804 F.2d 353 (6th Cir.1986); *United States v. Jones*, 759 F.2d 633 (8th Cir.1985); *United States v. Merritt*, 695 F.2d 1263 (10th Cir.1982); *United States v. Jackson*, 652 F.2d 244 (2d Cir.1981).

In *Trueber*, the First Circuit held that minimal use of a gun does not exceed the bounds of a permissible *Terry* stop. *Id.* at 94. The agent who stopped Trueber drew his weapon, kept it at his side, pointed it at the ground and re-holstered it quickly. *Id.* The court also noted the neutral character of the public street on which Trueber was stopped and the brief nature of the fifteen minute encounter. *Id.*

In *Taylor*, the First Circuit held that no *de facto* arrest occurred despite the fact that: (1) at least two of the ten to twelve officers on the scene had their weapons drawn; (2) the suspects were removed from the vehicle and placed face-down on the ground while they were pat-frisked; (4) the suspect's vehicle was blocked by police cruisers; and (5) the detention lasted about thirty minutes. *Id.* at 21–22. The court noted that the suspects were not handcuffed until drugs and weapons were actually discovered, the encounter took place on a public street, and the officers re-holstered their weapons after the occupants of the vehicle were secured.

With regard to this issue, the defendant cites two cases, *United States v. Strickler*, 490 F.2d 378, 379–80 (9th Cir.1974) and *United States v. Trullo*, 809 F.2d 108, 109–13 (1st Cir.1987).

In *Strickler*, the Ninth Circuit stated that "we simply cannot equate an armed approach to a surrounded vehicle whose occupants have been commanded to raise their hands with the brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information." *Id.* at 380 (internal quotation marks omitted). *Strickler* supports the defendant's position, but, unlike the Ninth Circuit, the First Circuit has held an armed approach to a surrounded vehicle may be a *Terry* stop. *See Taylor, supra.*

Defendant cites *Trullo* as what the First Circuit once characterized as "represent[ing] the outermost reaches of a permissible *Terry* stop." *Id.* at 111. In *Trullo*, two officers approached a vehicle stopped at a traffic light in Boston's "Combat Zone" carrying people who the officers believed were engaged in drug trafficking

based on the officers'·recent observations. *Id.* at 111–12. One officer had his weapon drawn. *Id.* at 113.

Although more officers with guns drawn were present, this case is comparable to *Trullo.* Moreover, *Taylor* and *Trueber* indicate that *Trullo* no longer represents the "outermost reaches" of what can constitute a *Terry* stop.

Thus, the court concludes that a reasonable person in Hart's position would not have believed he was under arrest until MacDonald took his weapon and Berte handcuffed him. Therefore, the initial stop of Hart was a *Terry* stop rather than an arrest. Since the stop was justified at its inception and the actions the police took were reasonably related in scope to the circumstances that justified the stop in the first place, Hart's Fourth Amendment rights were not violated.

Once the police found Hart's weapon, there was probable cause to arrest him. The fact that the police would have arrested Hart and brought him to the police station even had they not found a weapon is not material. *See United States v. Trueber,* 238 F.3d 79, 92 (1st Cir.2001) (holding that subjective intent of agents is irrelevant); *United States v. Quinn,* 815 F.2d 153, 157 (1st Cir.1987) ("[A] policeman's subjective 'unarticulated plan' has no significance for these purposes.").

IV. ORDER

In view of the foregoing, it is hereby ORDERED that Hart's Motion to Suppress Evidence Seized Pursuant to a Warrantless Search Conducted on July 5, 2001 (Docket No. 125) is DENIED.