**UNITED STATES of America, Plaintiff,**

v.

**Luis GINES–PEREZ (1), et als., Defendants.**

**No. CR. 98–164(DRD).**

United States District Court, D. Puerto Rico.

Aug. 5, 2002.

Steve Potolsky, Miami, FL, Miriam R. Ramos–Grateroles, San Juan, PR, for Luis Gines–Perez.

Epifanio Morales–Cruz, Federal Public Defender's Office, San Juan, PR, for Efren Andrades.

Jorge L. Arroyo–Alejandro, San Juan, PR, William D. Matthewman, Boca Rotan, FL, for Ricardo Melendez–Perez.

Edwin O. Vazquez–Berrios, U.S. Attorney's Office, Hato Rey, PR, for U.S.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

Before the Court is Defendants' Luis Gines–Perez' ("Gines–Perez" or "Defendant"), motion to suppress evidence, filed on April 16, 1999. (Docket No. 93). The matter was referred to Magistrate Judge Justo Arenas for a Report and Recommendation ("R & R"), on April 19, 1999. (Docket No. 95). The Government responded to the motion to suppress, on May 5, 1999. (Docket No. 99). After procedural housekeeping, and hearings on the matter, Magistrate Arenas issued his R & R, on June 20, 2000. (Docket No. 247). The R & R recommended denial of Gines–Perez' motion to suppress, and granted the Defendant thirty-days (30) days to file objections thereto. Gines–Perez filed his objections to the R & R, on July 20, 2000. (Docket No. 260).

Eventually, Gines–Perez filed a motion to **reopen** the suppression hearing based upon proffered, "newly-discovered," material evidence, on April 4, 2001. (Docket No. 362). Thereafter, further hearings were held and Magistrate Arenas issued a new R & R, on May 6, 2002, again recommending that Defendant's motion to suppress be denied. (Docket No. 485). The Defendant filed his objection thereto, on May 20, 2002. (Docket No.492).

Finally, in order to better assess itself as to the facts and law, the Court provided the parties yet another opportunity to address the issue of suppression. Accordingly, oral argumentation was authorized on this limited issue, at a hearing held on July 2, 2002, in Court. (Docket No. 503). The Court has examined the matter closely reviewed the transcripts and reached a conclusion. For the reasons stated below, the Court hereby **DENIES** Gines–Perez' motion to suppress (Docket No. 93).

## I

## FACTUAL BACKGROUND

The facts in this case shall be outlined retrospectively, from the moment of the arrest of the defendants, to the facts underlying the arrest and which led to their arrest. The Court deems this to be the best way of understanding and grasping the issues this case presents.

### A. ARREST OF THE DEFENDANTS

On July 6, 1998, the motor vehicle driven by the defendant, Gines–Perez, was stopped and searched by several state police agents. The search uncovered 1.4 kilograms of heroin, as well as several incriminating documents, and approximately $5,000 in cash.[1] The only other person in the vehicle at the time of detainment, was co-defendant Efren Andrades. The three agents investigating and involved in this incident were Domiciano Martinez, a police officer of the Puerto Rico Police Department assigned to the United States Customs Service Task Force; Jose Fernandez, a Special Agent for U.S. Customs; and officer Montanez, also a police officer of the Puerto Rico Police Department. These agents acted in coordination, communicating through their radio devices, on the day of the arrest.

On the night of the arrest, on July 6, 1998, the United States Customs Service Task Force was conducting surveillance at San Juan's Pier 6. Specifically, personnel from the High Intensity Drug Trafficking Areas program (HIDTA), were investigating crew members aboard the cruise ship M/V Sensation. Agent Fernandez was in charge of the surveillance operation; and Officer Martinez and Montanez were under his orders. At approximately 6:00 pm, Officer Martinez saw a suspect in the investigation enter a Vietnamese restaurant, in Old San Juan.[2] Then, at approximately 8:30 pm, Officer Martinez spotted the defendant, Gines–Perez,[3] park a green Honda Civic in front of the restaurant, and then enter said restaurant.[4] Inside the restaurant, another agent saw Gines–Perez speaking with another person, later identified as Efren Andrades, who was not the crew member who had first entered the restaurant earlier.[5] Efren Andrades was another crew member of the tourist cruise ship Sensation. As the defendant himself explained in his original motion to suppress, an agent "observed defendant Gines–Perez meet with *another* crew member, later identified as co-defendant, Efren Andrades, a Columbian national." (Docket No. 93, p. 2) (emphasis in original). (The "another" expressed herein is because a crew member who was subject to surveillance prior thereto had entered said Vietnamese restaurant.) Gines–Perez remained in the restaurant for approximately fifteen (15) minutes, and at 8:45

---

1. The record indicates it was $5,150.00 See Transcript, p. 52, Docket No. 179.

2. The Vietnamese Palace Restaurant, in Old San Juan. See Transcript, p. 8, Docket No. 180. Officer Martinez testified that he observed a suspect crew member enter the restaurant "around six in the afternoon." Transcript, p. 6, Docket No. 180.

3. As will be discussed shortly, *infra*, Gines–Perez was subject to another investigation; and even though he was not the target of the cruise-ship investigation that night, he soon became involved in the same. Also, as will be discussed below, Officer Martinez recognized Gines–Perez from a photograph he had seen, and sought information regarding the vehicle he was driving, the Green Honda.

4. Transcript, p. 6, Docket No. 180.

5. The record reflects that the object of investigation that night was "originally the other person ... in another case." Transcript, p. 55, Docket No. 180.

pm, he exits the restaurant with Andrades.[6]

After exiting the restaurant, Gines–Perez and Andrades boarded the Green Honda parked in front of the restaurant. Gines immediately started the engine, while they continued conversing in the vehicle. A few minutes later, Officer Martinez—who was parked directly behind the green Honda Civic—observed that **the passenger (Andrades) quickly lifting his shirt like showing something to Gines. At that moment, "Gines looked down and then the passenger quickly lowered his shirt again and they drove off."**[7] Thereafter, they took off in the car. Gines–Perez then went around the block, drove by the Vietnamese Restaurant again, but did not stop. After noting the licence plate number of the green Honda, Officer Martinez immediately communicated the information through radio, to the Puerto Rico Police in Arecibo, and shortly received notice that the vehicle was reported stolen.[8] Officer Martinez, who was in constant communication with Agent Fernandez, informed Agent Fernandez of this. Consequently, Officer Martinez received instruction from Fernandez to stop the green Honda, and immediately began executing said instructions.

Officer Martinez ordered the green Honda to stop. After the green vehicle stopped, Officer Martinez blocked it with his car. The officer stepped out, approached the green Honda, and informed Gines–Perez that he had been stopped because the vehicle was reported stolen and that a search for weapons needed to be conducted. Initially, Gines–Perez became somewhat agitated, claiming that the vehicle belonged to his ex wife, although Officer Martinez does not recall whether Gines–Perez provided him with documental evidence to show he had authorization to possess the vehicle.

The Defendant eventually calmed down and began cooperating, and provided Officer Martinez with his drivers license. Gines–Perez nonetheless requested documentation from Officer Martinez showing that the vehicle was stolen, to which Martinez simply responded that there was a "complaint number assigned" to the case. Then, Gines–Perez stated that he had no problem with the search, but cautioned that if anything was "found" or missing, "it would not be his fault." Gines–Perez then got out of the car, and co-defendant Andrades also got out of the car voluntarily. Neither were personally searched, nor handcuffed. When Andrades got out of the vehicle, he immediately, and voluntarily started to explain that Gines was merely giving him a "lift," and that he was an employee of the cruise ship Sensation.[9]

Officer Martinez proceeded to inform Agent Fernandez via radio that the driver had consented to a search, and that he would proceed with said search. Agent Fernandez, who was in the vicinity, arrived just when the search was to begin, and assisted in the search. Following the search, Agent Fernandez found a "heroin belt" with duct tape packaging. The belt was on the floor on the front, under the passenger seat, and it was protruding from under the seat. Agent Fernandez described it as a "dark strap" or belt, made

---

6. Transcript, p. 8, Docket No. 180.

7. Transcript, p. 9, Docket No. 180. *See also* R & R, footnote 12, p. 13, Docket No. 485.

8. In reality, the vehicle had a Police "lien" meaning one of three alternatives: a) stolen; b) loaned (not duly returned); or c) disappeared (see discussion *infra*). However, the report received by state officer Martinez indicated that the car was "stolen."

9. Transcript, p. 14, Docket No. 180.

out of velcro, with "gray duct tape attached to it." "It was made out of velcro with packages tied around it in belt type manner, to be fitted around the waist of a human being." [10] And according to Agent Fernandez, his experience in the field let him "know" that the belt "containe[d] some type of controlled substance, possibly heroin or cocaine." [11] Officer Martinez immediately placed the defendants under arrest, after providing them with notice of their Miranda rights. [12] A more detailed search revealed a briefcase with documents and approximately $5,150 in cash.

The defendants were driven to a High–Intensity Drug Trafficking Area (HIDTA) office, where they were again provided the Miranda warnings, and were interviewed. Their interviews began approximately at 9:30 p.m. Gines–Perez gave an exculpatory statement: he explained that he had consented to the search inside the vehicle he was driving because he "had nothing to hide." Co-defendant Andrades likewise made a similar statement.

## B. ORIGIN OR SOURCES OF THE ARREST

1) *DTOP's computer database.* As stated above, Officer Martinez stopped and arrested the passengers of the green Honda after confirming information that the vehicle was stolen. When Officer Martinez first saw the green Honda being driven by Gines–Perez, on the night of the arrest, he immediately called the Arecibo Police Headquarters of the Puerto Rico Police, via a radio transmitter, in the northern town of Arecibo, and talked to an unspecified person, a radio dispatcher, to confirm whether the vehicle was in fact stolen. [13] At the hearing conducted in Magistrate Arena's court room, a witness named Sergio Irizarry Silva testified that the terminals used by his department to ascertain the status of vehicles basically depend on a computerized database belonging to Puerto Rico's Department of Transportation and Public Works ("DTOP," for its Spanish acronym). [14] Captain Sergio Irizarry–Silva, is a police officer and director of the Information, Communication and Analysis Center of the Puerto Rico Police. He explained that the DTOP's database was the "official record" used by the Police Department, which is regularly updated. He further explained that the system has security codes. Captain Irizarry had personal access to the database at all times, and stated that the database did not belong to the Police Department Thus, when Officer Martinez saw the green Honda being driven by Gines–Perez, on the night of the arrest, the source of the information provided to him via radio originated from the DTOP's computer database.

The information in the DTOP's database, which was provided to Officer Martinez via radio, merely indicated that the green Honda had a "Police lien" ("gravamen," in Spanish). He testified that the use of the word "lien" in the system could mean three different things, to wit, that a vehicle was either stolen, loaned (and not duly returned) or that it had simply disappeared. Beyond that, the system was incapable of providing more specific informa-

---

**10.** Transcript, pp. 47–48, Docket No. 179.

**11.** Transcript, p. 49, Docket No. 179.

**12.** Transcript, p. 24, Docket No. 180.

**13.** See Transcript, pp. 79–80, Docket No. 180; p. 8, Docket No. 179.

**14.** The DAVID system printout is "where all the information on vehicles registered in Puerto Rico." Transcript, p. 29, Docket No. 180.

tion. Captain Irizarry explained that the database was eventually improved in early 1999. He had personally requested that it be changed because he recognized that the word "lien" was too generic, the three possible meanings (i.e., loaned/stolen/disappeared) created confusion.

Gines–Perez had become the object of police investigation sometime in mid-May or June of 1998. There was information that an associate of Gines–Perez, a man named Miguel Huertas, had "borrowed" Gines–Perez' car, presumably the green Honda. Additionally, there was information that at some point Gines–Perez had reported that the vehicle was "stolen." But it was later learned from a confidential source, that Miguel Huertas had returned the vehicle. Officer Martinez felt compelled to follow Gines–Perez on the night of the arrest precisely because the information provided to him on the radio was that it had been "stolen."

On cross-examination, Captain Irizarry noted that there is a report which indicated that the green Honda had been recovered at some point previous to the arrests, and that the case had been "closed." Notwithstanding, the information in the computer database remained unaltered and consequently there remained a "lien" on the vehicle. Indeed, on July 6, 1998, the information had not been removed from the computer, notwithstanding the "lien" should have been deleted on/or around May 25, 1998 (approximately forty-two (42) days transpired).

Captain Irizarry stated at the hearing that if appropriate steps would have been taken, the incorrect information pointing to a "lien" on the green Honda would have

been deleted by the day of the arrest. He explained however that this had occurred many times before, because there were too many computer entries which had not been properly updated, and at times the notice of "lien" on vehicles was not removed. He stated that reliance on any system was troublesome.[15] But he also testified that the information database belongs to the DTOP, not the Police, although the police had access to the information. Finally, Captain Irizarry noted that, in order to make changes in the database, "a document" (or a formal written request) requesting said change to the information, is necessary. In any event, when Officer Martinez stopped and arrested the passengers of the green Honda, he acted relying on the information provided to him over the radio, which in turn originated from the DTOP's computer database, which the Puerto Rico Police constantly uses for investigative purposes.

2) *Identification based on information available on the Internet.* It is also important to underscore, that Officer Martinez had recognized Gines–Perez when he was entering the Vietnamese restaurant, on the night of the arrest, because he had recently seen a photograph of him.[16] Agent Fernandez had shown Officer Martinez the photograph, which Fernandez accessed from the website, through the Internet. As the defendant stated in his memorandum of law regarding the suppression hearing, "Agent Fernandez has presumably shown him an Internet photo of the Defendant and indicated that he was under investigation by U.S. Customs." *See* Defendant Gines' Memorandum of Law on Issues raised at Suppression

---

**15.** Specifically, he stated that "no system" is reliable. Transcript, p. 29, Docket No. 183.

**16.** Officer Martinez stated that he identified Gines–Perez from a photograph he had seen,

and that he recognized him that night because of the beard on his face, that is, his facial hair. Transcript, p. 63, Docket No. 180.

Hearing, p. 1, Docket No. 93. The photograph was supposedly downloaded from an alleged "private" Internet site. Accordingly, the Defendant claims to have had a legitimate expectation of privacy as to said web site. The photograph, however, was a group portrait of all the employees at a computer, techno store, managed by Gines–Perez. At the time that Agent Fernandez accessed the Defendant's web page, it was maintained, operated and controlled by Gines–Perez as though it were, in fact, owned by him. The Defendant alleges that he did not "intend" for the Web page to become a "commercial" site. The web page had not been finalized nor become a viable commercial entity on the Internet, at the time the agents accessed it. Rather, it was still "under construction." Gines–Perez, again, claims he had an expectation of privacy as to the site. Notwithstanding, the Court notes that the web site was being constructed to be accessed by potential commercial clients.

The testimony at hearing revealed that a search warrant to "seize" the photograph was never issued. Counsel for the defense has argued that there is no valid exception to the Fourth Amendment's warrant requirement to "search" and "seize" information (be it written or graphical) downloaded from a site on the world wide web, or Internet. Counsel for the defense has made the argument that use of the photograph of Gines–Perez was, thus, illegal, for identification purposes. They argue that, consequently, the use of said photograph by the police officers was the "venom" that infected the poisonous tree. As such, defendant argues that the physical evidence seized from the defendant is the "fruit of the poisonous tree." [17]

The Government, on the other hand, has alleged that the Defendant's expectation of privacy regarding an Internet site is unwarranted, and that it is an expectation which our society is not prepared to recognize as "reasonable." Magistrate Arenas noted the following, regarding the Defendant's Internet site, in the R & R issued on May 6, 2002:

The remaining question then is whether defendant had an expectation of privacy that society is prepared to recognize as reasonable. The particular Web page the World Wide Web user encounters is a direct result of affirmative acts taken by him or her. Here, defendant's Web page was online at the time Agent Fernandez' gained access to it. The Web page was not located on a secure network, but rather on an unsecure [sic] one, those accessible to and normally used by the public. The address could be used by the World Wide Web user, in this case Agent Fernandez, to locate defendant's Web page from any computer with access to the World Wide Web. After locating this address, the World Wide Web user could then view the information contained on the Web page and, like the agent, download graphics from it. There is not evidence to conclude that the Web page stated: "Warning" or "Do not Copy." The Web page did not employ protective measures or devices that would have controlled access to the Web page or the photograph

17. The "fruit of the poisonous tree" doctrine first developed by the Supreme Court in the case of *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Nevertheless, the Supreme Court coined the "fruit of the poisonous tree" language, for the first time, in *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). In *Nardone,* the Court expanded on the *Silverthorne* decision by asserting that evidence found as a result of the government's wrongs is not always inadmissible, if the government can show that it would have gained that knowledge through some independent source.

itself. The Web page was not protected with a password, which would have actually refused access by undesired or unknown visitors.

*See* R & R, p. 9, Docket 485.

After examining the R & R's issued by Magistrate Arenas, and the memoranda filed by both the Government and counsel for the defense, the Court is in a position to properly review the issues presented in this case.

## II

## ANALYSIS

There are several basic issues which arise in this case, related to the suppression of evidence. The first is whether the stopping of the green Honda, and the eventual search of said vehicle, was constitutionally acceptable. The second issue relates to the information used to stop the defendants, such as the computer database used by the Police force; and the information which was downloaded from a web site (specifically, Gines–Perez' photograph), and which aided Officer Martinez in identifying Gines–Perez, on the night of the arrest. The defense objects to the use of the information, based on several grounds. The Court shall address these separate—albeit related—issues successively. The Court begins by tackling the issue of whether the stopping of the green Honda, followed by a warrantless search of said vehicle, passes constitutional muster.

## A. DEFENDANTS' VEHICLE STOP AND SEARCH WAS JUSTIFIED IN LIGHT OF THE TOTALITY OF CIRCUMSTANCES

■ Not all state interaction with its citizens rises to the constitutionally-protected levels, of a "stop" or "seizure." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)(collect-ing cases). Police may approach citizens in public spaces and ask them questions without triggering the protections of the Fourth Amendment. *Id.* Indeed, the Fourth Amendment protections are not activated when, in light of all circumstances, a reasonable citizen would have felt free to terminate the police intervention and a court determines that he could have proceeded along his way. *Bostick,* 501 U.S. at 439, 111 S.Ct. 2382; *United States v. Sealey,* 30 F.3d 7, 9 (1st Cir.1994). In the absence of an officer's exertion of physical force or an individual's submission to a show of authority, no "seizure" occurs. *United States v. Young,* 105 F.3d 1, 6 (1st Cir.1997).

■ An "investigative stop," or a "Terry stop," occurs when a police officer, acting on **reasonable suspicion** of criminal activity, briefly detains a citizen to confirm or dispel his suspicion. *Id.* The Supreme Court has in recent years explained that this type of investigative stop is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons, and has widened this exception to encompass other circumstances where officers may make brief investigative stops or seizures of individuals upon reasonable suspicion that they may have committed, are committing, or are about to commit a crime. *See United States v. Quinn,* 815 F.2d 153, 156 (1st Cir.1987). All in all, there is no mechanical formula to facilitate the distinction between such investigative stops, on the one hand, and those detentions, on the other, which though not technical, formal arrests, are the "equivalent" to an "arrest" and therefore require probable cause. *Id.* A formal "arrest," on the other hand, occurs when an officer, acting on probable cause that an individual has committed a crime, detains that individual as a suspect. *Id.*

■ The First Circuit Court has rejected the argument that "every incidence of physical contact, even *de minimis*, between a police officer and a citizen, constitutes an arrest requiring probable cause." *Id.; United States v. Zapata,* 18 F.3d 971, 977 (1st Cir.1994). Moreover, the First Circuit Court has recognized that "[p]arsing whether any given seizure constitutes an arrest or a lesser seizure ... proves a difficult task." *Young,* 105 F.3d at 7. Police intervention rises to the level of an arrest only when a reasonable man in the subject's position would have understood his situation to be tantamount to an "arrest," in light of the **totality of the circumstances.** *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151–52, 82 L.Ed.2d 317 (1984). The phrase "totality of the circumstances" essentially means that a case-by-case determination is required from the Courts. Accordingly, "[w]hether police activity is reasonable in any particular context depends on the facts which are unique to that incident." *United States v. Kimball,* 25 F.3d 1, 6 (1st Cir.1994). Again, a case-by-case inquiry is required.

■ As the Supreme Court recently reiterated, that *per se* rules are inappropriate in the Fourth Amendment context. The proper inquiry—stated the Court—"necessitates a consideration of all the circumstances surrounding the encounter." *See United States v. Drayton,* —— U.S. ——, 122 S.Ct. 2105, 2111, 153 L.Ed.2d 242 (2002)(*citing Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991))(internal quotations omitted).

Factors that can elevate a non-arrest seizure to a *de facto* arrest requiring probable cause include extending an investigative stop beyond the time necessary to confirm or dispel reasonable suspicion, and physically blocking the suspect's exit such that a reasonable person would not feel free to leave. The use of guns and the presence of more than one police officer, however, do not necessarily convert an investigative stop into an arrest. Above all else, our cases in this area evince the fact specific nature of the inquiry.

*Young,* 105 F.3d at 7–8. For example, the First Circuit Court, in *Quinn,* explained that **the mere presence of several officers and the blocking of an individual's car** does not, in itself, convert a simple investigative stop into an arrest. *See Quinn,* 815 F.2d at 156–57. In fact, not even the use of a drawn gun by a police officer converts an investigative stop into an arrest. *United States v. Trullo,* 809 F.2d 108, 113 (1st Cir.1987), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987). "An action tantamount to arrest has taken place if the officers' conduct is more intrusive than necessary for an investigative stop." *United States v. Rose,* 731 F.2d 1337, 1342 (8th Cir.1984).

■ An officer may arrest a citizen only upon the reasonable belief that there is probable cause that he or she committed a crime or is about to commit a crime. *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). Probable cause to carry out an arrest without a judicial warrant will depend upon "whether, at the moment the arrest was made, ... the facts and circumstances within [the arresting officers'] knowledge and or which they had reasonably trustworthy information were sufficient to warrant an prudent man in believing [the person arrested] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). However, **it is not necessary that an officer have personal knowledge** of all the items of information which, taken together, constitute probable

cause of an arrest without a warrant; it is enough that "the collective knowledge and information of all of the officers involved establishes probable cause." *United States v. Rose*, 541 F.2d 750, 756 (8th Cir.1976), *cert. denied*, 430 U.S. 908, 97 S.Ct. 1178, 51 L.Ed.2d 584 (1977).

 The Court today believes that **reasonable suspicion**—as opposed to probable cause—is sufficient to render the warrant requirement unnecessary, pursuant to all the circumstances of this case. After all, "[t]he touchstone of the Fourth Amendment is reasonableness...." *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 591, 151 L.Ed.2d 497 (2001). In cases such as this one, the reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999). Also, when dealing with warrantless searches, ordinary Fourth Amendment analysis requires consideration of the **totality of the circumstances**. *Knights*, 122 S.Ct. at 593 ("Fourth Amendment analysis ... considers all the circumstances of a search...."). Furthermore, "[a]lthough the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such standard reasonable." *Id.*, at 592. The circumstances of the present case lead the Court to believe that reasonable suspicion is sufficient to render the warrant requirement unnecessary.

In the present case, the Court is convinced that the totality of circumstances, of the collective knowledge of all officers involved in the operation, show that the stop, search, seizure and subsequent arrest of the defendants was firmly premised on reasonable suspicion. In other words, the initial stop of the vehicle was legal, pursuant to the Fourth Amendment; thus, the eventual seizure of evidence, by virtue of the stop, was legally obtained. Thus, after reviewing the totality of the circumstances, the Court rejects and denies the defendants' motion to suppress.

A review of the record reveals several factors which support the conclusion that there was reasonable suspicion to intervene the defendants, without a warrant. The following are several factors supporting the Court's conclusion that there was reasonable suspicion to stop the Green Honda. On the night of the arrest, the United States Customs Service Task Force was conducting surveillance at San Juan's Pier 6, near a docked cruise ship. Specifically, personnel from the HIDTA, was investigating crew members on board the cruise ship M/V Sensation. Agent Fernandez was in charge of the surveillance operation; and Agent Martinez was under his orders. At approximately 6:00 pm, Officer Martinez saw a suspect in the investigation enter a Vietnamese restaurant, in Old San Juan. Then, at approximately 8:30 pm, Officer Martinez spotted the defendant, Gines–Perez, park a green Honda Civic in front of the restaurant, and then enter said restaurant. Inside the restaurant, another agent saw Gines–Perez speaking with another person, later identified as Efren Andrades, who was not the crew member who had first entered the restaurant earlier and was under surveillance. Efren Andrades was "another crew member" of the tourist cruise ship, Sensation. As the defendant himself explained in his original motion to suppress, an agent "observed defendant Gines–Perez meet with *another* crew member, later identified as co-defendant, Efren Andrades, a

Columbian national."[18] (Docket No. 93, p. 2) (emphasis in original). After exiting the restaurant, Gines–Perez and Andrades boarded the Green Honda parked in front of the restaurant. Gines immediately started the engine, while they continued conversing in the vehicle. A few minutes later, Officer Martinez—who was parked directly behind the green Honda Civic—observed that **the passenger (Andrades) quickly lifted his shirt like showing something to Gines. At that moment, "Gines looked down and then the passenger quickly lowered his shirt again and they drove off."**[19] Thereafter, they took off in the car. Gines–Perez accompanied by Andrades as a passenger then went around the block, drove by the Vietnamese Restaurant again, but did not stop. After noting the licence plate number of the green Honda, Officer Martinez immediately communicated the information through radio, to the Puerto Rico Police in Arecibo, and shortly received notice that the vehicle was reported stolen.[20] After following the vehicle, and communicating the information collected amongst themselves, Officer Martinez received instructions from Agent Fernandez to stop the vehicle, and so Martinez did. Following the search, Agent Fernandez found a "heroin belt" with duct tape packaging. The belt was on the floor on the front, under the passenger seat, and it was protruding from under the seat. Agent Fernandez

described it as a "dark strap" or belt, made out of velcro, with "gray duct tape attached to it." "It was made out of velcro with packages tied around it in belt type manner, **to be fitted around the waist of a human being.**"[21] And according to Agent Fernandez, his experience in the field let him "know" that the belt "containe[d] some type of controlled substance, possibly heroin or cocaine."[22]

But these are not the only factors pointing to **reasonable suspicion**. Other facts support this conclusion. For example, Gines–Perez had been subject to another money-laundering/drug-related investigation, since the beginning of 1998, that is, four months before being arrested.[23] The HIDTA agents had received, from a confidential source, information that Gines–Perez was spotted driving a Green Honda Civic, licence tag BMZ–287. This information was entered into a database which was available to Customs and Treasury. Agent Fernandez was not part of this investigation and did not know the details of the investigation. A United States Customs Report of Investigation (ROI) dated July 21, 1998, reflects that on March 3, 1998, Special Agent Melvin de la Torre ("Agent de la Torre") interviewed a confidential source who provided the information about the car. Another ROI dated June 6, 1998, reflected that on March 6,

---

18. The reference to "another crew member" made by counsel for Gines–Perez is because previously a crew member of the cruise ship Sensation, and target to the investigation, had two (2) hours prior thereto, entered and still remained at the Vietnamese restaurant.

19. Transcript, pp. 8–10, Docket No. 180. Officer Martinez described that, after Andrades lifted his shirt, Gines–Perez was "[l]ooking at the part of the body [of Andrades] that was being exposed." *Id.*, p. 10. Furthermore, Martinez explained that he was parked directly behind Gines' car, "bumper to bumper,"

and that "[t]he area was appropriately illuminated." *Id.*

20. In reality, the vehicle had a Police "lien" meaning one of three alternatives: a) stolen; b) loaned (not duly returned); or c) disappeared (see discussion *infra* ).

21. Transcript, pp. 47–48, Docket No. 179 (emphasis added).

22. Transcript, p. 49, Docket No. 179.

23. *See* R & R, pp. 3 et seq., Docket No. 485.

1998, task force agents followed the defendant from a location known as "Phone Home," a.k.a. Multiplix ("Multiplix"), in a green Honda Civic.

A Task Force Agent named Fidel Ramos testified before Magistrate Judge Arenas that he was involved in HIDTA's Multiplix investigation in 1997. On March 6, 1998, he was involved in a surveillance at Multiplix. During the surveillance, someone who later became known as Gines–Perez was observed nervously entering a business establishment, and tripping on the stairs to the entrance of said establishment. **Gines–Perez was seen carrying a sports bag.** He came out after an hour, and entered the Green Honda he had arrived in. Photographs were taken that day. The Green Honda was followed to Gines–Perez' home in Encantada, Trujillo Alto. It is important to note that, although Agent Fernandez knew generally about the investigation, and he knew that it was drug-related, he had no knowledge whatsoever as to the type of car being driven by Gines–Perez,[24] because he was not in charge, nor participated in the same. On the other hand, Officer Martinez knew Gines–Perez was being investigated; however, the transcript of his testimony discloses that he did not know that it was a drug-related investigation, and much less what type of car Gines–Perez drove.[25] Additionally, Agent Fernandez had knowledge that Gines–Perez had been previously arrested in 1996, for failing to report that he was carrying more than $10,000 in U.S. currency, while traveling abroad.[26]

These factors, added to the fact that Officer Martinez received notice via radio, on the night of the arrest, that the Green Honda was stolen, firmly support the conclusion that there was reasonable suspicion to stop said vehicle. The Court deems that, pursuant to the totality of the circumstances, Officer Martinez clearly had reasonable suspicion to believe that a crime was being committed. *Knights*, 122 S.Ct. at 592–593. Furthermore, it matters very little whether the car was, in fact, stolen, or whether the computer database accessed was unreliable, or whether the information provided to Officer Martinez via radio was not necessarily accurate. Again, **it is not necessary that an officer have personal knowledge** of all the items of information which, taken together, creates reasonable suspicion to briefly detain someone without a warrant. *Id.* It is enough that "the collective knowledge and information of all of the officers involved" establishes reasonable suspicion that a crime was being committed. *Rose*, 541 F.2d at 756. But more importantly, the interest "in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise," and particularly those that are doing so in plain view, on the public streets of our cities, lead the Court to conclude that reasonable suspicion is constitutionally sufficient to render the requirement of a warrant unnecessary. *Id.*

Lastly, at the oral argument as to the *de novo* review hearing held on July 2, 2002, the defense argued that the testimony provided by Officer Martinez clearly indicated that the **only** reason why he intervened with the Green Honda, was because it had been reported stolen. Expressed alternatively, the defense contends that the only reason the Green Honda was stopped and searched was because it was stolen. Nevertheless, the subjective intentions of an officer does not preclude the Court's **independent** obligation to ascer-

---

**24.** See Transcript, p. 78, Docket No. 179.

**25.** See Transcript, p. 51, 87, Docket No. 180.

**26.** Transcript, p. 15, Docket No. 181.

tain the totality of the circumstances. "As long as there is a valid reason for a stop, the officer's subjective motivation is irrelevant." *See, e.g., United States v. Pringle,* 751 F.2d 419, 425 (1st Cir.1984)(motivation for boarding is irrelevant; the test is whether an objective basis existed). Furthermore, the Supreme Court of the United States has been "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)(the Supreme Court "foreclose[d] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"). Probable cause as well as reasonable suspicion, must be determined in light of the collective knowledge of the law enforcement officers involved in an investigation, *Maryland v. Garrison,* 480 U.S. 79, 85, 107 S.Ct. 1013, 1017, 94 L.Ed.2d 72 (1987)("[T]he existence of probable cause is to be evaluated on the basis of the collective information of the law enforce-

ment officers engaged in a particular investigation"), pursuant to an objective view of the facts. *Knights,* 122 S.Ct. at 593 (reasonable suspicion analysis "considers all the circumstances of a search"); *see also United States v. Diallo,* 29 F.3d 23, 25–26 (1st Cir.1994)("probable cause must be determined in light of the information known to the police at the time of the arrest"). In this case, the Court is convinced that, pursuant to the totality of the circumstances, and all of the above factors, Officer Martinez, acting upon orders of Officer Fernandez, had reasonable suspicion to stop the Green Honda and search the vehicle. *See Drayton,* 122 S.Ct. at 2111. The Court reaches this conclusion notwithstanding that distinguishing whether any given seizure constitutes an arrest or a lesser seizure is not an easy endeavor. *Zapata,* 18 F.3d at 975.[27] In retrospect, the defense has focused exclusively on the "stolen vehicle" lien, instead of the totality of circumstances as constitutionally required. Nonetheless, the Court has

---

**27.** In sum, the totality of circumstances reflects that the two arresting officers had knowledge of the following facts:

a) Gines–Perez was the subject of previous surveillance for money-laundering and illegal drug-trafficking, a fact known by Agent Fernandez (Transcript, p. 78, Docket No. 179);

b) Agent Fernandez, furthermore, had knowledge that Gines–Perez had been previously arrested in 1996, for failing to report that he was carrying more than $10,000 in U.S. currency, while traveling abroad (Transcript, p. 15, Docket No. 181);

c) Gines–Perez entered a restaurant which was under surveillance wherein at least two crew-members, of the cruise-ship Sensation, had entered (Transcript, p. 6, Docket No. 180);

d) Gines–Perez leaves the restaurant, approximately fifteen (15) minutes after entering and speaking with one of said crew-members, namely, Andrades (Transcript, p. 8, Docket No. 180);

e) Andrades and Gines–Perez left restaurant together (*Id.*);

f) Andrades and Gines–Perez boarded the car, and according to the transcripts on record, once in the car, Andrades lifted his shirt as to show Gines something, and Gines looked down towards what Andrades was showing him; Officer Martinez, who was directly parked behind the green Honda Civic and who observed this, explained that the area was well lit (Transcript, pp. 8–9, Docket No. 180);

g) Gines–Perez then drove the car around the block twice, passing in front of the Vietnamese restaurant, without stopping (Transcript, p. 11, Docket No. 180);

h) the car driven by Gines–Perez was reported as "stolen" (Transcript, p. 7, Docket No. 180);

i) Officer Martinez quickly identified Gines–Perez as the person he had seen in a photo, when Agent Fernandez showed it to him, and told him Gines–Perez was under investigation (Transcript, pp. 6–7, Docket No. 180).

reached its conclusion, after examining the totality of circumstances. The Court shall now address other issues raised in the motion to suppress.

## B. MIRANDA RIGHTS

Although the Court is in general agreement with the conclusion reached by Magistrate Judge Arenas, the Court does not agree with some of the legal determinations found in the recommendations. Magistrate Arenas found, first, that when the vehicle Gines–Perez was driving was stopped by Officer Martinez, he "was not free to go at any time," and thus the car was "seized"; the R & R concludes that he "was *de facto* and *de jure* under arrest." *See* R & R, p. 14, Docket No. 247. The Court, however, disagrees.

■ Indeed, the inquiry into whether a detention was a mere investigative stop and not a *de facto* arrest is crucial for determining whether it was necessary to provide the citizen being detained with the Miranda warnings. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Quinn*, 815 F.2d at 160 (the touchstone to the need for Miranda warnings has been whether or not a suspect is "in custody"; conversely said warnings are not required when the suspect is *not* in custody). Generally, Miranda warnings are not required during mere investigative stops. *Id.* But if a person is subjected to restraints comparable to those of a formal arrest, he must be advised of his Miranda rights. *Id.*

■ As restated above, distinguishing whether any given seizure constitutes an arrest or a lesser seizure is not an easy task. *Zapata*, 18 F.3d at 975. Police intervention rises to the level of an arrest only when a reasonable man in the subject's position would have understood his situation to be tantamount to an "arrest," pursuant to the totality of the circumstances. *Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138. All in all, the final determination of whether police activity is "reasonable" in any particular context depends on the facts of each incident. *Kimball*, 25 F.3d at 6. Albeit relatively close, the Court is convinced that the defendants in this case were not originally subject to "arrest." As stated above, the arrest ensued only after the green Honda was searched and the narcotics were found. That was the critical moment of arrest, not before.

The mere presence of several officers and the blocking of Gines–Perez' car did not convert a simple investigative stop into an arrest. *Quinn*, 815 F.2d at 156–57. The officers did not restrain Gines–Perez's freedom of movement. The officers never communicated to him verbally that he was under arrest or that they wanted to arrest him. *See, e.g., Young*, 105 F.3d at 8. The Court reasons, moreover, that a reasonable man would only believe that he was being detained for investigation, not placed under arrest. *Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138. Thus, in light of the officers conduct, the incident fell short of a *de facto* arrest.

■ It was not until Agent Fernandez found the "heroin belt" in the car that the officers proceeded to place the defendants under arrest. Therefore, the Court does not agree with Magistrate Arenas that the defendants were placed *ab initio* under arrest. The Court does, however, agree with the R & R in that Gines–Perez consented to the search of the vehicle he was driving, and no Miranda warnings were previously required. As stated above, the Miranda warnings are not mandated when the suspect is not in custody. *Quinn*, 815 F.2d at 160. Since the Court has determined that the defendants were not in custody before the discovery of the heroin the vehicle, Gines–Perez' voluntary and

spontaneous consent to the search of the vehicle—albeit with his disclaimer—was constitutionally valid. Therefore, even if the Court were to assume for the sake of argument that Officer Martinez lacked probable cause to make the initial stop, the Court agrees with the Magistrate's R & R that the consent provided by Gines–Perez cured any constitutional defect. Thus, on this score, the defense's objections fail.

## C. POLICE COMPUTER ERROR

The other issue raised by the defense was that the information used by Officer Martinez, regarding the status of the green Honda, was false. The Court is of the opinion that too much emphasis has been placed on this one circumstance, instead of focusing on the proper constitutional standard of the totality of the circumstances. Notwithstanding, the Court tackles the issue.

Gines–Perez argues that the vehicle was not stolen at the time of the arrest, and therefore, the police's intervention was illegal. At the outset, the Court must underscore, as it has done repeatedly, that it is not necessary for an officer to have personal knowledge of all the items of information necessary to conduct a search and an arrest without a warrant. *Rose,* 731 F.2d at 1343. Legally, it is enough that the collective knowledge and information of all of the officers involved establish reasonable suspicion, on the totality of the information available and known to the intervening officers, from his perspective. *Id.* Thus, it was not necessary for Officer Martinez to have personal knowledge or up-to-date information regarding the status of the car. His job was simply to reasonably ascertain his suspicion regarding the status of the car, and to intervene with the vehicle, if he received confirmation that it was reported as "stolen." Because he had no duty to have personal

knowledge of all possible items of information necessary to intervene, the defense's argument that the information provided to him was unreliable, must fail.

Furthermore, Officer Martinez acted properly and reasonably when he called in via the radio to ascertain the status of the green Honda. The law cannot require him to personally verify the information provided to him via radio, or to question it. There is simply no indication that the arresting officer was not acting objectively and reasonably when he relied upon the information provided to him. This necessarily brings us to the discussion of the *Evans* doctrine.

The Supreme Court of the United States recently held that evidence seized in violation of Fourth Amendment as result of clerical errors of court employees, causing incorrect computer records, fell within the good faith exception to the exclusionary rule. *Arizona v. Evans,* 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). Both Honorable Magistrate–Judge Arenas and the Defendant have thoroughly discussed *Evans.* In *Evans,* a citizen was arrested by the police during a routine traffic stop when a patrol car's computer indicated that there was an outstanding misdemeanor warrant for his arrest. A subsequent search of his car uncovered a bag of marijuana. Thus, he was charged with possession of marijuana. When the police notified the Justice Court that they had arrested him, the Justice Court discovered that the arrest warrant previously had been quashed and so advised the police. Eventually, the defendant moved to suppress the marijuana as the fruit of an unlawful arrest, in light of the fact that the misdemeanor warrant had been in fact quashed before his arrest. The defense in that case argued that the good faith exception to the exclusionary rule was not applicable to him since it had been **police error,** not

judicial error, which caused the invalid arrest.

The trial court in *Evans* granted the motion to suppress, concluding that **the State** had been at fault for failing to properly quash the warrant, and that there was no distinction in the State action, whether it happened to be the police department or any other branch of the state. The trial court in Arizona, thus, **made no factual finding** as to whether the **Justice Court or the police office** was responsible for the continued error regarding the quashed warrant in the computer records. *See Evans,* 514 U.S. at 5, 115 S.Ct. at 1188.

The Arizona Court of Appeals reversed. And later, again, on appeal, the Arizona Supreme Court reversed the Court of Appeals. The Court rejected the "distinction drawn by the court of appeals ... between clerical errors committed by law enforcement personnel and similar mistakes by court employees." *Id.* at 6, 115 S.Ct. 1185.

Subsequently, the United States Supreme Court granted *certiorari* "to determine whether the exclusionary rule requires suppression of evidence seized incident to an arrest resulting from an inaccurate computer record, **regardless of whether police personnel or court personnel were responsible for the record's continued presence in the police computer.**" *Id.* (emphasis added). The Court, applying the reasoning of *United States v. Leon,* 468 U.S. 897, 906, 104 S.Ct. 3405, 3411–12, 82 L.Ed.2d 677 (1984), found that the exception to the exclusionary rule was applicable to the facts at hand, "even **assuming** ... that responsibility for the error rested with the justice court...." *See Evans,* 514 U.S. at 14, 115 S.Ct. at 1193 (emphasis added). The Court held that exclusion of evidence at trial would not sufficiently deter future errors so as to warrant such a severe sanction. And notwithstanding

that the Court, for the most part, analyzed the law **assuming** *arguendo* that Arizona's court employees were responsible for the computer error, this Court finds the rationale of *Evans* (and *Leon* ) to be fully applicable to the case at hand, because in this case, there is also no indication that the arresting officer was not acting objectively reasonably when he relied upon the computer record. The Court explains.

As noted above, the Supreme Court in *Evans* found that exclusionary rule does not require suppression of evidence seized incident to an arrest resulting from an inaccurate computer record, **regardless of whether police personnel or court personnel were responsible for the record's continued presence in the police computer.** *See Evans,* 514 U.S. at 6, 115 S.Ct. 1185. Following the rationale of *Leon, supra,* the Court held that exclusion of evidence at trial would be a severe sanction to the government, because under the circumstances of the case, it would not sufficiently deter future errors by the Police. Likewise, this Court finds that, pursuant to said reasoning, the exclusion of the evidence seized by Officer Martinez would, under the circumstances of the case, not be a deterrent for future errors by the Police. As Magistrate Judge Arenas properly characterized, the incorrect information regarding the status of the green Honda, which was provided to Officer Martinez, had its source in a database belonging to Puerto Rico's DTOP, not the Police Department. At the time of the arrest, the information found therein indicated that the green Honda had a "lien," which, in turn, meant that it was stolen; but it could have also meant that it was either loaned and not timely returned or disappeared. But it is undisputed that Gines–Perez had in fact reported it as "stolen," at a undisclosed time before his arrest. It is

also undisputed that the vehicle was later returned, and that said information was provided to the Police, weeks before the arrest (that is, forty-two days). However, for whatever reason, the information was not corrected. In fact, the information had not been checked at the time of the hearing before Magistrate Arenas. In any event, notwithstanding the information should have been corrected, the Court finds that, under the standard of "reasonableness" established in *Evans*, there is no indication that the arresting officer was not acting objectively reasonably when he relied on the computer record. *Id.* at 16, 115 S.Ct. 1185.

The Defendant argues that the Supreme Court's holding in *Evans* is inapplicable because said ruling was made regarding an error committed by the computer system of a State's (Arizona's) court system, not its police department. However, the Court reiterates that a careful reading of *Evans* discloses that the Supreme Court framed the issue in the terms of ascertaining whether the exclusionary rule required the suppression of evidence seized incident to an arrest resulting from an inaccurate computer record, **regardless of whether police personnel or court personnel were responsible for the record's continued presence in the police computer.** *See Evans*, 514 U.S. at 6, 115 S.Ct. 1185. And in any event, even though the Court, for the most part, analyzed the case by assuming *arguendo* that it was Arizona's **court employees** who were responsible for the computer error, the Court did not base the

critical determination on that fact.[28] **The trial Court simply ruled that, regardless of whether it was a police computer error, or a court's computer error, the controversy was undoubtedly born out of state action.** Thus, the Defendant's argument clearly must fail. The holding in *Evans*, thus, is applicable to the case at hand. As such, the Court must reiterate that pursuant to the standard of "reasonableness" established in *Evans*, there is no indication that Officer Martinez was not acting objectively reasonably when he relied on the computer record.

Defendant strongly argues that Agent Fernandez knew or should have known that Gines–Perez regularly drove the Green Honda Civic that belonged to his ex wife because another customs investigation so revealed. The Court rejects this argument, first, because even though Agent Fernandez accepts he had general knowledge about other on-going investigations— for instance, he knew Gines was subject to another drug-related investigation—the record reveals he did not know the type of car Gines–Perez was driving.[29] Documents were produced by the defense team as to the Customs collateral/Multiplix investigation relating to Gines–Perez in 1994 and in 1998, but none of the documents show that Agent Fernandez was ever involved in said investigation. On the other hand, Officer Martinez is a local police officer who did not have knowledge about the investigation, besides the fact that Gines was under investigation in another case.[30] The defense alleges that somehow,

---

28. As a matter of law, the Highest Court was precluded from making such a determination because—as the Court's majority opinion emphasized—the trial court in that case **never made a factual finding** as to whether the Justice Court or the police office was responsible for the continued information of the quashed warrant in the computer records. *See Evans*, 514 U.S. at 5, 115 S.Ct. at 1188.

29. See Transcripts, p. 78, Docket No. 179; pp. 73–81, Docket No. 179; pp. 15–16, Docket No. 181.

30. Transcript, pp. 51, 87, Docket No. 180.

at the moment of arrest, Agent Fernandez should have examined and reviewed all the documents and computer files and entries relating to Gines–Perez in Customs custody and discovered that Gines–Perez regularly drove a green Civic Honda. But the Court considers the request to be completely unreasonable. Agent Fernandez and Officer Martinez had to make immediate decisions, at critical times, and the Court harbors no doubt that the totality of circumstances clearly supported Fernandez and Martinez' determination to stop the green Honda Civic at the precise moment that they did. Without a doubt, the stop had to be done right then and there. The facts supporting reasonable suspicion as to alleged drugs in the car—*i.e.*, surveillance of crew members at the dock and restaurant; lifting of shirt by Andrades in the car; etc.—were occurring then, at that precise moment, successively, in a matter of minutes. It seems unreasonable to actually require these agents to stop everything and examine all the Customs documents to ascertain the type of automobile Gines–Perez was seen driving, in another investigation. Further, assuming these agents would have been required to take these actions, and provided Fernandez and Martinez would have done so, the licence plate number would not have matched, because the record reflects that the licence plate number in the file relating to the other Multiplix investigation was not the exact same as the number on the Green Honda Civic, on the night of the arrest.[31] It was not unreasonable to simply check the DTOP's computer, although in this case there was error.

■ Lastly, the underlying *raison d'etre* of *Evans* is deterrence of improper state action or conduct. The record is bereft of any evidence that shows that either Officer Martinez or Agent Fernandez knew about the computer error in the system. Moreover, the Court is convinced that, notwithstanding the faulty computer system used by the government in this case, and that the car had been returned, there was reasonable suspicion to stop and search the Green Honda, pursuant to the totality of the circumstances stated above. Therefore, the defense's contention fails.

## D. CONSTITUTIONAL PRIVACY AND THE INTERNET

Finally, the Court addresses the contention that, by accessing and downloading information from an Internet site, the government violated Gines–Perez' right of privacy. Specifically, Gines–Perez contends that the photograph used by Officer Martinez to identify him, on the night of the arrest, was illegally downloaded from an alleged "private" web site.

It is clear from the record that it was Agent Fernandez who, prior to the night of the arrest, downloaded a picture of Gines–Perez from the Internet, and showed it to Officer Martinez in order to assist him in enforcing the law. The specific photograph in question was a group portrait of all the employees working at Gines' techno-store, the Red Gecko, a computer shop. Gines–Perez claims that the act of accessing his web site and downloading his photograph constituted state action which violated his privacy rights under the Constitution. He claims that the web site was "private," and was under construction, at the time when the Government accessed the site. In other words, he claims that the general public could not access the site, and that it was not being used for commercial purposes, at the time of accessing it, again, because it was under construction.

31. *See* Docket No. 485, p. 2.

■■■■ The Court notes that this matter is one of first impression, and no clear guidance is available in case law. The Court believes, however, that the applicable test is that of a claim to privacy under the Constitution. Accordingly, the test on this issue is, first, whether a person has exhibited an actual (subjective) expectation of privacy; and second, whether the expectation of privacy is one that society is prepared to recognize as "reasonable." *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The Court believes Gines–Perez' contention fails on both prongs.

A user of the Internet "may either type the address of a known page or enter one or more keywords into a commercial 'search engine' in an effort to locate sites on a subject of interest. . . . Users generally explore a given Web page, or move to another, by clicking a computer 'mouse' on one of the page's icons or links." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 852, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). The Court is convinced that placing information on the information superhighway necessarily makes said matter accessible to the public, no matter how many protectionist measures may be taken, or even when a web page is "under construction." While it is true that there is no case law on point regarding this issue, it strikes the Court as obvious that a claim to privacy is unavailable to someone who places information on an indisputably, public medium, such as the Internet, **without taking any measures to protect the information.**

The defense may claim that the web site in controversy was not intended to be "public" or "commercial" in nature. But it is not the intention of the person who uses the Internet to communicate information which is important; it is the medium in which he or she places the information and the nature of the materials placed on the web which are important. A person who places information on the information superhighway clearly subjects said information to being accessed by every conceivable interested party. Simply expressed, if privacy is sought, then public communication mediums such as the Internet are not adequate forums without protective measures.

The Court finds that Gines–Perez does not have a subjective expectation of privacy, notwithstanding his claim to the contrary. A reasonable person cannot place "private" information—such as a "private" photograph—on the Internet, if he or she desires to keep such information in actual "privacy." A reasonable person does not protect his private pictures by placing them on an Internet site. Thus, Gines–Perez' contention is unacceptable.

But Gines–Perez also fails in the second prong. *Katz*, 389 U.S. at 361, 88 S.Ct. 507. The Court finds that this society is simply not prepared to recognize as "reasonable" a claim that a picture on the Internet is "private" in nature, such that the Government cannot access it. In fact, the Court believes that our society would recognize the opposite; that a person who places a photograph on the Internet precisely intends to forsake and renounce all privacy rights to such imagery, particularly under circumstances such as here, where the Defendant did not employ protective measures or devices that would have controlled access to the Web page or the photograph itself. Thus, the Court agrees with the R & R. Gines–Perez' claim is unpersuasive.

More importantly, the Court notes that the specific photograph here in controversy was disclosed to associates of Gines–Perez, in his techno-store, Red Gecko. Even if is true that the defendants web page was "under construction," it is uncontested that the defendant intended for the web page to be used for commercial purposes, under the business name Red

Gecko, sometime after the arrest. Indeed, the defense admits that the photograph in question consists of a group portrait of all the employees at Red Gecko. **The Court is convinced that this was clearly a commercial photograph, placed on the under-construction web page, for obvious commercial, marketing purposes.** Notwithstanding, the Court underscores that it is not the subjective intention of the person that places information on the web which is important, but the objective use of the medium itself, and the objective nature of the materials, which are truly pivotal. Furthermore, the Court cannot accept the proposition that the web site or the photograph was "private" in nature, because the same was revealed to other, third parties and intended further to be revealed to the public, and thus the defendant cannot have a reasonable expectation of privacy. Thus, the defense's contention must fail. Finally, Gines–Perez alleges that "but for" Agent Martinez' recognition of defendant from said photograph, he would have not checked the license tag of defendant's car via radio, and thus he would not have had probable cause or suspicion to stop, search and eventually arrest the Defendant. But the Court has already found that the totality of circumstances override any subjective reason provided by the officer. *United States v. Pringle*, 751 F.2d at 425. Because the Court has found that the picture found on the Internet does not violate the privacy rights of Gines–Perez—which is the underlying premise of his argument—this argument also fails. The Court affirms at that, the R & R's conclusions.[32]

### III

In conclusion, the recommendations made by Magistrate Arena are

**ADOPTED.** (Dockets Nos. 247 & 485). **WHEREFORE,** the Court hereby **DENIES** Gines–Perez' motion to suppress (Docket No. 93).

**IT IS SO ORDERED.**

---

32. Further, the Court notes that, considering all the factors pointing to reasonable suspicion, stated in footnote no. 27, *supra,* the photograph is but one factor included in the totality of circumstances; however, without the photograph, all the other circumstances on the night of the arrest, nonetheless, clearly and firmly support reasonable suspicion, in light of the totality of the circumstances stated above.